CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review, pursuant to N.J.S.A. 54:3-21, of the 1981 and 1982 assessments on its property located at 181 Long Hill Road, Little Falls, New Jersey (Block 237, Lots 38A, 40, 40A, 41, 42, 42A and 43A). The assessments for both years aggregated $4,681,600, allocated as follows:
*320 Land $ 326,700
Improvements 4,354,900
Total $4,681,600[1]
At issue are the binding effect of a purported settlement of the ease for 1981, true value and whether plaintiff is entitled to statutory relief from a discriminatory assessment pursuant to chapter 123, L.1973.
The subject of the controversy is 20.43 acres of land improved with a garden apartment and townhouse complex of 300-dwelling units. The physical setting is a promontory of breathtaking beauty, with mountain vistas to the northwest and the Manhattan skyline distantly limned in the southeast. The topography varies from gently rolling to sharp gradient changes, with some natural rock outcroppings augmenting the ambient charm.
The buildings, predominantly constructed between 1972 and 1974, are of brick over aluminum siding, with a rustic overlay on some structures of cedar shake. The interface of the buildings with the topography is an architectural masterpiece.[2]
The units are grouped into 11 buildings composed of the following types of apartments:
22 studios
22 studios with recreation room
66 one bedroom
66 one bedroom with recreation room
124 townhouses
All units have forced-air heat and air conditioning. The furnace in each building is gas-fired with power supplied by the landlord, which also furnishes each unit with a four-burner range-oven, refrigerator-freezer, exhaust fan and blinds. Dishwashers are also furnished in all units except the studios. The property is serviced by all public utilities including municipal *321 water and sewer. Amenities include on-site paved parking, two swimming pools, outdoor tennis and basketball courts and children’s play areas. The area is well landscaped with lawns, shrubs and trees. There are no signs of deferred maintenance.
At all times pertinent hereto a rent-levelling ordinance was in effect in the defendant municipality. Until about May 3, 1982 that ordinance limited annual rent increases to 40% of the increase in the consumer price index (CPI) from the date of execution of a lease to the date of the lease’s expiration. On or about May 3, 1982 the ordinance was amended to permit rent increases equal to 50% of the CPI change and to provide for vacancy decontrol, i.e., the landlord was allowed to charge a new tenant market rent. Under the ordinance a landlord could recover a local property tax surcharge from his tenants if taxes were increased from one year to the next and if, in the year of such increase, the total tax exceeded 20% of the landlord’s gross rental income. The ordinance also provided for hardship rent increases whenever the municipal rent-levelling board found that the landlord’s rate of return on invested capital fell below a just and reasonable rate.
The aforementioned amendment dealing with vacancy decontrol was the subject of heated public debate in the defendant municipality beginning around May 1981, when the proposed adoption of vacancy decontrol was advertised in local newspapers. Several hearings were conducted before the municipal governing body between May and October 1981, when the governing body voted to adopt vacancy decontrol and to change the measure of automatic rent increases from 40% to 50% of the CPI. These hearings were attended by large numbers of tenants and representatives of tenant organizations, all in opposition to vacancy decontrol.
Plaintiff filed tax appeals for the years 1977 and 1978 concerning the subject property with the Division of Tax Appeals and for 1979 and 1980 with this court. Those appeals were settled by written stipulation dated January 23, 1981. That document, inter alia, fixed the 1980 assessments at $4,681,600 and provided that the freeze act would apply for 1981. The stipulation, signed by counsel for both parties, was transmitted *322 to the Tax Court Clerk’s office by letter dated January 27, 1981 from plaintiff’s attorney, who referred therein to a “fully executed Stipulation of Settlement for years 1977-1981.” Judgment was entered in the Tax Court on April 16, 1981 reflecting the agreement of the parties concerning the assessments for 1977 through 1980. The judgment included no reference to that provision of the stipulation dealing with the freeze act for 1981.
A pretrial order in this case made no reference to the settlement, nor to the disposition of 1981 on the basis of the freeze act. The case for 1981 was tried to a conclusion before me on February 2 and 3, 1983. The issue of a settlement of the year 1981 on the basis of the freeze act incident to a settlement of docketed cases for prior years did not arise until defendant’s presentation of its case in chief, during the course of which counsel proffered in evidence a series of documents tending to show such a settlement. Plaintiff objected to their introduction on the ground that the issue was not preserved in the pretrial order. The court deferred ruling on plaintiff’s objection and permitted the issue to be addressed on brief.
I conclude that plaintiff is foreclosed from litigating the 1981 assessment by reason of the settlement stipulation by which plaintiff is legally bound. The long standing policy of our courts favors settlement of litigation. Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 134 A.2d 761 (1957); Honeywell v. Bubb, 130 N.J.Super. 130, 325 A.2d 832 (App.Div.1974). To be sure, the enforcement of settlement agreements remains in the sound discretion of the court. Jannarone v. W.T. Co., 65 N.J.Super. 472, 168 A.2d 72 (App.Div.), certif. den. 35 N.J. 61 (1961); see Jackson Tp. v. Marsyll ofB.B. Inc., 3 N.J.Tax 386, 391-392 (Tax Ct.1981); cf. R. 8:9-5 (local property tax judgments may be entered pursuant to settlement supported by such proof as the court may require). Nothing in this record, however, warrants a conclusion that the settlement was anything but fair and equitable to both parties. Certainly, the terms of settlement of a local property tax ease may properly include an understanding that the freeze act will apply to the latest docketed year embraced in the settlement. South Plain-field v. Kentile Floors, Inc., 92 N.J. 483, 457 A.2d 450 (1983). *323 It is clear to the court that settlement of the earlier years and the agreement to apply the freeze act for 1981 were the product of intense, protracted negotiation between competent, knowledgeable counsel fully aware of the strengths and weaknesses of their respective litigating positions. The settlement so meticulously forged by their protean efforts was unambiguous, devoid of loose ends and complete on its face. No claim is made that defendant failed to honor the settlement or any part thereof. Indeed, plaintiff, in its reply brief, acknowledges defendant’s compliance in fixing the 1981 assessment at the same level as the assessment agreed upon for 1980.
Plaintiff argues, however, that irrespective of a settlement for 1981, the issue could not be raised at trial as it was not preserved in the pretrial order. It is, of course, axiomatic that a trial must be held within the framework of the pretrial order and the parties are limited to the issues therein raised. Rothman Realty Corp., v. Bereck, 73 N.J. 590, 376 A.2d 902 (1977); Lertch v. McLean, 18 N.J. 68, 112 A.2d 735 (1955). Issues not preserved in the pretrial order are deemed waived. Muntz v. Newark City Hospital, 115 N.J.Super. 273, 279 A.2d 135 (App.Div.1971). As with so many rules of broad application, however, there are exceptions. R. 4:25 — 1(b), incorporated in Tax Court practice by R. 8:6-2, provides in pertinent part:
When entered, the pretrial order becomes part of the record, supersedes the pleadings where inconsistent therewith, and controls the subsequent course of action unless modified at or before the trial or pursuant to R. 4:9-2 to prevent manifest injustice____ [Emphasis supplied]
R. 4:9-2 provides, pertinently:
... If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings and pretrial order, the court may allow the pleadings and pretrial order to be amended and shall do so freely when the presentation of the merits of the action will be thereby subserved and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence. [Emphasis supplied]
The circumstances of this case warrant relaxation of the rule confining a trial to the issues raised in the pretrial order. The modifications and amendments contemplated by the cited *324 rules of court are appropriate and the pretrial order is deemed amended. Plaintiff was not prejudiced by the introduction in evidence of proofs pertaining to the settlement. Plaintiff’s counsel was fully aware of the settlement as he was an active participant in the negotiations preceding it. He could thus not claim to be surprised by those proofs, nor did he so claim. He did not seek a continuance to meet defendant’s evidence in this regard. Indeed, there was no contrary evidence, plaintiff having acknowledged that provision was made in the settlement for 1981.
In view of the foregoing I conclude that plaintiff is foreclosed from any further reduction in the 1981 assessment.
With respect to 1982 the valuation estimates of the parties’ experts and the analytical tools which they employed are as follows:
Plaintiff Defendant
True value • $6,956,700 $11,000,000
Approaches to value Income Income, cost
Approach principally relied upon Income Income
Economic rent $1,746,373 $1,780,000
Vacancy allowance -0- -0-
Expenses $551,446 $469,100
Effective net income $1,194,927 ' $1,310,900
Capitalization rate [3] 17.5% [4] 12.93% [5]
Effective capitalization rate [6] 17.18% 11.91%
*325 As indicated in this columnar presentation, defendant’s expert utilized the cost approach as well as the income approach. His estimate of replacement cost under the former method was $16,000,000 before depreciation. He estimated the cost of land at $4,000 a unit or $1,200,000. He viewed the cost approach, as applied to the subject property, as an indicator of the upper limit of value and as an application of the principle of substitution, i.e., no prudent investor will pay more for a property than the amount for which the site can be acquired and for which improvements can be constructed without undue delay. The expert’s use of the cost approach in this context reflects sound appraisal principles. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) 442. Moreover, his cost figures are derived from a reliable source, namely, the Real Property Appraisal Manual for New Jersey Assessors. Even if his unsupported estimate of land value were substantially reduced, the resultant overall figure would still represent the upper limit of value and a valid application of the principle of substitution.
In any event, defendant’s expert placed principal reliance upon the income approach, which I find to be the most probative indicator of the value of the subject property. It is well settled that the income approach is of preponderant influence in the valuation of apartment properties. Helmsley v. Fort Lee, 78 N.J. 200, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979); Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 417 A.2d 1124 (App.Div.1980); G & S Co. v. Eatontown, 2 N.J.Tax 94 (Tax Ct.1980).
Plaintiff’s gross income estimate is based upon an average of actual gross income of $1,683,954 for calendar-year 1980 and $1,808,791 for calendar-year 1981. Gross income for both *326 those years consisted of apartment and garage rentals, security forfeitures, late fees, laundry commissions and pool fees and miscellaneous. Defendant’s gross income was also derived from an analysis of what the expert was led to believe was actual gross income for 1980 and 1981, except that defendant’s expert did not average the two-years’ income; rather, he utilized the actual income for 1981 as the economic rent. I find defendant’s approach to be more in accord with reality. Whatever the putative investor’s view of expenses, he will certainly project future gross income (as distinguished from net income) to be no lower than that reflected in the latest income statement. Neither expert posited a vacancy or collection loss allowance and the municipality’s rent-levelling ordinance did permit automatic rent increases, no matter how stringent that ordinance may appear. The figures used by defendant's expert for actual gross income, however, were incorrect. The correct gross income for 1981 was $1,808,791, as reflected in the appraisal report of plaintiff’s expert. I find that figure to be the economic rent for the subject property on the assessing •date. Actual rents charged in a well-managed large apartment complex with short-term leases constitute prima facie evidence of economic rent. Parkview Village Ass’n v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972). Good management is presumed. G & S Co. v. Eatontown, supra.
The experts also differ in their expense estimates by some $82,000, virtually all of which is attributable to four items. Plaintiff posits a reserve for replacements of $34,927 (2% of gross income), while defendant makes no such provision; the experts are $4,000 apart on payroll expense; plaintiff assumes repairs and maintenance at 5% of gross income ($87,319) while defendant postulates $39,900, the average of actual expenses for the years 1979, 1980, and 1981; and plaintiff estimates the management fee to be 5% of gross income, while defendant claims that such charge should not exceed 3%.
Plaintiff must prevail on the issue of replacement reserves. Its expert estimated the replacement cost for each item *327 of equipment supplied by the landlord, namely, refrigerator-freezer, air conditioner, range, blinds and dishwasher, then multiplied the total cost of those items by the number of dwelling units (making suitable adjustment for the absence of dishwashers in the studios) and divided the total by the number of years of estimated useful lives of the items. The quotient was an amount substantially in excess of his postulated replacement reserve of $34,927. Provision for replacement reserves is in accord with sound appraisal principles, as is the expert’s method of calculating those reserves. The Appraisal of Real Estate, supra at 362, 368-369; see Gerrodette, “Appraisal of Apartment Properties,” Encyclopedia of Real Estate Appraising, (3 ed. 1978) 245, 267-268.
Plaintiff’s expert posits $68,000 for the salaries of a superintendent, an assistant superintendent and maintenance personnel. His assumption is consistent with the average salaries for those categories for 1980 and 1981. Defendant’s expert posited salaries for the same positions at $64,000, the average of the years 1979, 1980 and 1981. The salaries for 1979, however, were substantially lower than the salaries for 1980 and 1981. In this era of relentlessly escalating expenses, the prudent investor would disregard the earlier of the three years in predicting the future levels of supervisory and maintenance salaries. Thus, the salary levels posited by plaintiff’s expert are more in accord with reality; and I will use his estimate of $68,000 in determining expenses.
The assumption made by plaintiff’s expert fixing repair and maintenance expenses at 5% of gross income is not supported by credible evidence. The actual expenses in that category averaged approximately $59,000 for 1980 and 1981. Defendant’s expert, relying primarily upon a three-year average (1979, 1980 and 1981), posits repair and maintenance expenses at $39,900. As with salaries, the repair and maintenance expenses were substantially lower in 1979 than they were in 1980 and *328 1981. Again, the prudent investor would disregard the earlier years in estimating future expense levels. I therefore find that $59,000 represents a reasonable amount for repair and maintenance expenses.
The final area of expense in which the experts differ is the management fee. Plaintiff’s expert postulates 5% of gross income, while defendant’s expert concludes that 3% is a reasonable allowance. Defendant must prevail on this issue. Management includes such activities as on-site supervision, accounting and clerical assistance. The Appraisal of Real Estate, supra at 365. Much of the on-site supervision of the subject property is provided by the resident superintendent and assistant superintendent and their salaries are already reflected in operating expenses. Management’s responsibility for engaging independent tradesmen to perform maintenance and repair work is reduced by the on-site, full-time employment of maintenance personnel, provision for whose salaries is also made in operating expenses. Management’s duties with respect to vacancies and collection of delinquent rents are at a minimum, both experts having postulated that there will be no vacancies or collection losses in the foreseeable future. Finally, the historic experience of the property reflects management expenses of 3.7% of gross income for 1977, 1978 and 1979.
Accordingly, I find a management fee equal to 3% of gross income to be appropriate.
We are left with the most significant aspect of this case, namely, the selection of an appropriate capitalization rate and the effect thereon of the municipality’s rent-levelling ordinance and the ordinance providing for vacancy decontrol. An important subsidiary point is the selection of the appropriate tax rate, as a component of the overall capitalization rate.
Plaintiff contends that the appropriate capitalization rate is that used by its expert, namely, the effective rate of 17.18%. *329 This rate, plaintiff continues, reflects the putative investor’s concern over rent control and the adverse effect thereof on the quality of the net income stream. Plaintiff points specifically to the restrictive nature of a property tax surcharge,[7] the absence of all other expense surcharges and the limitation of automatic rent increases to a fraction of the change in the consumer price index. Finally, plaintiff relies upon the testimony of a mortgage broker, called as an expert on real estate acquisition financing, for the proposition that, during the period under review, the marketplace showed little interest in rent-controlled properties.
As for vacancy decontrol, plaintiff argues that, inasmuch as the ordinance pertaining thereto was not enacted until May 1982 the court may not consider it, as the evidence is insufficient to show that the adoption of vacancy decontrol was foreseeable on the assessing date (October 1, 1981). Plaintiff urges in the alternative that vacancy decontrol has no effect on the subject property as the tenant turnover therein is minimal.
Defendant argues, on the other hand, that the effective rate of 12.7% used by its expert is more reflective of marketplace reality, that the benefits of ownership outweigh any disadvantage attributable to rent control. Defendant points to the physical amenities, the prospect of appreciation over time and the income tax benefits associated with the ownership of income producing real property. Defendant also argues that the prospect of conversion to cooperative or condominium ownership enhanced the property’s value in the eyes of the suppositious investor. Defendant’s expert, however, acknowledged the adverse effect of rent control on an investor’s perception of the quality of the investment but he felt this was neutralized by vacancy decontrol. He opined, further, that without the prospect of vacancy decontrol on the assessing date he would have increased his capitalization rate by lk% to 1%.
*330 The determination of an appropriate rate by means of which net income is capitalized to ascertain true value for tax purposes requires consideration of a host of factors, many of them interdependent and of varying weight. Notwithstanding the need for such evaluation — and the plethora of more or less objectively ascertainable factors — the determination inescapably calls for the exercise of subjective judgment. See 1 Bonbright, Valuation of Property 266 (1937). After weighing and considering the testimony of the experts and the evidence offered in their support I conclude that the weight of the evidence favors defendant.
To begin with, the subject property, like all large apartment properties with little or no vacancies, enjoys benefits of ownership found in no other type of investment. Those benefits include leveraged investment, tax benefits[8] in the form of current depreciation allowances (which, at an early date following the buyer’s acquisition may be expected to exceed his cash investment in the property) and favorable capital gains treatment upon sale and the prospect of appreciation in value. Moreover, the substantially higher cost of constructing an equivalent complex (even allowing for defendant’s tenuous land value), under the principle of substitution, enhances the subject’s value in the eyes of the prospective purchaser and strengthens the bargaining position of the seller. To be sure, rents in the subject property are controlled by a municipal agency whereas under the defendant’s rent-levelling ordinance the owner of a newly constructed apartment complex may initially charge market rents. This apparent advantage, however, is reduced, if not entirely offset, by expenses incurred during construction, including the opportunity cost of invested capital attributable to the construction period before the property can produce income.
*331 Furthermore, the imminent prospect of vacancy decontrol, which I find from the evidence to be reasonably foreseeable on the assessing date, will temper whatever effect the defendant’s rent-levelling ordinance might have on the investor’s determination of the price he should pay for the property. Plaintiff’s expert contends in this connection that vacancy decontrol has no effect on the income of the subject property, as the tenant population is composed predominantly of older citizens who tend to remain and thus, tenant turnover is minimal. The court is unable to draw a definitive conclusion in this regard from the visual inspection of the property. In any event, the age of the tenant population is not what matters. The fact to be proved is the degree of tenant turnover, not the demographic characteristics of the tenant population, for turnover is the key to the benefits of vacancy decontrol for the landlord. The facts in this regard could have been conclusively established by records in the possession of plaintiff’s management. The failure to produce those records, under the circumstances, warrants the inference that they are unfavorable to plaintiff’s position. Wild v. Roman, 91 N.J.Super. 410, 220 A.2d 711 (App.Div.1966); Hickman v. Pace, 82 N.J.Super. 483, 198 A.2d 123 (App.Div.1964). The prerogative to draw such an inference is not limited to a jury; the trier of fact in a non-jury case may also do so. Robinson v. Equitable Life Assur. Soc. of United States, 126 N.J.Eq. 242, 8 A.2d 600 (E. & A. 1939); Series Publishers v. Greene, 9 N.J.Super. 166, 75 A.2d 549 (App.Div.1950). Accordingly, I draw the inference that plaintiff’s records will disclose tenant turnover and conclude therefrom that vacancy decontrol substantially mitigates whatever adverse impact defendant’s rent-levelling ordinance might otherwise produce on the property’s net income.
Plaintiff, through its valuation expert as well as the mortgage broker who testified about the general state of mortgage markets, places heavy reliance upon the precise state of affairs obtaining at or about the assessing date, alluding to the high prime rate, high inflation, the fact that both purchasers and lenders were shunning fixed returns of any sort, and *332 the unavailability of the leverage required by tax motivated investors. Indeed, the valuation expert’s appraisal report shows that no mortgage loans of $100,000 or more were made during the second, third and fourth quarters of 1981 by the 20 life insurance companies surveyed by the American Council of Life Insurance. Plaintiff offered no evidence of conditions in the financial markets prior to the fourth quarter of 1979. Rates of return and interest rates shown in plaintiff’s appraisal report for 1979 and 1980 do not support the conclusion of plaintiff's expert relative to the capitalization rate. Plaintiff’s narrow focus on a constricted time frame proximate to the assessing date is unsound. The strong public interest in assessment stability and its corollary, stable, predictable municipal revenues, require that tax assessments not be hostage to sharp fluctuations traceable to volatile swings in the financial markets. New Brunswick v. Tax Appeals Div., supra; Murnick v. Asbury Park, 2 N.J.Tax 168 (Tax Ct.1981), rev’d on other grounds 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982). As our Supreme Court said in the New Brunswick case:
The taxpayer’s expert found [the rate of return] to be 6% for the year 1958____ With respect to 1959, the witness increased the rate to 6V2 because mortgage money was more costly on the assessing date for that year. We note in passing that the assessment process cannot be so acutely sensitive to such changes. It is not feasible for an assessor to adjust the rolls to the fluctuations of the mortgage market. The rate of return should reflects conditions for a reasonable span of years. It must be remembered that valuation for taxation cannot be dollar precise. [39 N.J. at 550, 189 A.2d 702]
In weighing and considering the evidence pertaining to the appropriate capitalization rate I have considered defendant’s ariguments relative to the prospect of conversion of the subject property to condominiums or. cooperatives. The evidence does not indicate that, on or around the assessing date, plaintiff was contemplating any such conversion, nor are there proofs from which one could conclude that conversion was reasonably foreseeable on or about such date. Defendant’s proofs of transactions occurring in December 1982, some 15 months after the assessing date are not probative of any state of facts existing on the latter date. Post-assessing date events are not probative of true value unless they corroborate facts in *333 existence on the assessing date or unless such events are reasonably foreseeable on the assessing date. Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332 (Tax Ct.1981), aff’d 6 N.J.Tax 255 (App.Div.1983), certif. den. 94 N.J. 606, 468 A.2d 238 (1983).
The final question to be addressed is the choice of tax rate. Plaintiff argues that the actual tax rate of $4.79 should be used where discrimination is not in issue, but that the effective tax rate, calculated by multiplying the actual rate by the chapter 123 average ratio, must be used where discrimination relief is sought. The defendant’s argument is direct and uncomplicated. If the taxpayer raises the issue of discrimination then the effective tax rate must be used. The problem can give rise to a “Catch-22” situation, and does so in this case. If the effective rate is used the ratio of assessment to value falls within the upper limit of the common level range (115% of the Director’s average ratio) and plaintiff is not entitled to discrimination relief. If the actual rate is used the ratio of assessment to value falls beyond the common level range and plaintiff is entitled to discrimination relief.
In Fort Lee v. Hudson Terrace Apts., supra, the Appellate Division declared that whenever discrimination is not proved the actual tax rate must be used. That decision offers no guidance in the instant ease, where a low average ratio (41%) produces a large disparity between actual and effective tax rates and a correspondingly great difference in the true value calculations; so great, in fact, as to make the difference between discrimination relief and affirmance of the assessment. The Hudson Terrace opinion, however, must be read in the context of the state of the law as it then existed regarding discrimination, i.e., the taxpayer was required to plead discrimination, which was viewed as a separate cause of action. See Cleff Realty Co. v. Jersey City, 41 N.J.Super. 465, 125 A.2d 423 (App.Div.1956), certif. den. 23 N.J. 58, 127 A.2d 227 (1957); Anaconda Co. v. Perth Amboy, 157 N.J.Super. 42, 384 A.2d 531 (App.Div.1978), certif. den. 81 N.J. 55, 404 A.2d 1155 (1979). *334 The Cleff and Anaconda cases and their progeny antedated the enactment of chapter 123, the statutory basis for discrimination relief. It is now the law that entitlement to discrimination relief pursuant to chapter 123 is an issue in every case and litigants are not required to plead it. Weyerhaeuser Co. v. Closter Boro., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div. 1983), certif. den. — N.J.-, — A.2d-(1983).
In the famous New Brunswick case our Supreme Court concluded that the tax expense was best represented by application of the common level of assessments, expressed as a percentage, to the actual tax rate. Significantly, the Court did not condition the use of such method upon a finding of discrimination. 39 N.J. at 546-547, 189 A.2d 702.
Until the enactment of chapter 123, courts in tax discrimination cases sought the common level of assessments, i.e. that percentage of true value at which the generality of properties in the taxing district was assessed. See, e.g., In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961); Piscataway Assoc. v. Piscataway, 73 N.J. 546, 376 A.2d 527 (1977); Continental Paper Co. v. Ridgefield Park, 122 N.J.Super. 446, 300 A.2d 850 (App.Div.1973). Relief was granted where the taxpayer could show that his property was assessed substantially higher than the common level of assessments prevailing in the taxing district. Piscataway Assoc. v. Piscataway, supra. With the enactment of chapter 123, the taxpayer was no longer required to prove the common level or, for that matter, the absence of it. He merely had to prove the true value of his property and that the ratio of the assessment to such value was beyond the upper limit of the common level range, i.e., 115% of the Director’s average ratio. Having established that, he became automatically entitled to relief by application of the Director’s ratio to the true value of his property.
It will thus be seen that with the advent of chapter 123, the common level of assessment, which taxpayers had labored so strenuously to establish by means of sales-ratio clusters, coefficients of deviation and similar arcane statistical devices, *335 was replaced by the Director’s average ratio, a number readily available and known to all concerned. To put it in a slightly different way, the Director’s average ratio, promulgated pursuant to chapter 123, became, by statute, the common level of assessment. Thus, whether or not discrimination is an issue— and it is bound to be an issue where the Director’s average ratio is as low as it is in this case — the only effective substitute for actual tax expense is the effective tax rate, as our Supreme Court told us 20 years ago. That rate is determined in this case by multiplying the actual rate ($4.79) by the chapter 123 average ratio (41%).
In view of the foregoing I find the true value of the subject property on October 1, 1981 to be $10,349,340, determined under the income method as follows:
Gross income $ 1,808,791
Less vacancy & loss allowance -0-
Effective gross income $ 1,808,791
Expenses:
Insurance $ 19,962
Heat and cooking gas 152,706
Electricity 23,625
Water 18,490
Superintendents’ salaries 40,000
Pool salaries 4,807
Payroll - 3 handymen @ $4.50/hr. 28,080
Payroll taxes & group insurance 10,579
Painting & decorating 5,515
Repairs & maintenance 59,000
Supplies 4,795
Reserve for replacement (2%) 36,175
Landscaping & snow removal 16,607
Trash removal 13,715
Professional fees 3,000
Management (3%) 54,264
Total expenses 491,320
Effective net income $ 1,317,471
*336 Capitalized at 12.73% (including effective tax rate of 1.96)
True value $10,349,340
The provision of chapter 123 applicable to proceedings in this court, namely, N.J.S.A. 54:2-40.4, declares that a taxpayer is entitled to discrimination relief if the ratio of the assessment to the property’s true value, as found by this court, exceeds the upper limit of the common level range, defined in N.J.S.A. 54:1-35a as 115% of the average ratio promulgated by the Director of the Division of Taxation pursuant to N.J.S.A. 54:1-35.1. The average ratio so promulgated for the defendant taxing district for 1982 is 41% and the upper limit of the common level range is 48%. The ratio of the 1982 assessment of the subject property to its true value as hereinabove found is 45%. Plaintiff is thus not entitled to discrimination relief for 1982.
Judgment will be entered determining the assessment for both 1981 and 1982 to be as follows:
Land $ 326,700
Improvements 4,354,900
Total $4,681,600

Neither party advised the court of the breakdown of the total assessments among the enumerated lots. The parties appeared to view the assessments as a unitary aggregate and the court will do likewise.

All visual impressions recorded in this opinion result from an on-site inspection by the court, in the company of counsel, in the twilight hours of Monday, October 3, 1983.

Both experts used the building residual method. Plaintiff derived the land value by equalizing the land assessment of $326,700 by the chapter 123 ratio promulgated by the Director, Division of Taxation for 1982 (41%), thereby arriving at a land value estimate of $750,000. Defendant simply posited a land value of $4,000/unit or $1,200,000.

 12.5% interest, 3.0% recapture, 2.0% effective tax rate.

 9.0% interest, 2.0% recapture, 1.93% effective tax rate.

As neither expert supported his land value estimate with credible evidence, I will ignore their respective calculations of land value and test the probative *325 utility of their capitalization assumptions by converting their calculations into effective capitalization rates (i.e., net income divided by true value) and comparing those rates with the evidence submitted concerning market yields and investment alternatives during the relevant period.

Property taxes may be passed on to tenants only when such taxes exceed 20% of gross rental income. Neither party contends that this ever happened.

Our Supreme Court, as long ago as 1963, acknowledged the role of income tax benefits in tax valuation proceedings. See New Brunswick v. Tax Appeals Div., 39 N.J. 537, 551, 189 A.2d 702 (1963).