CRABTREE, J.T.C.
This opinion deals with the taxable value of the East Office Building (Block 3720, Lot 3), the West Office Building (Block 3720, Lot 2), and the parking facilities utilized by tenants of the office buildings (Block 3720, Lot 1 and Block 3712, Lot 22) at the Glen Pointe commercial and industrial development complex in Teaneck, New Jersey. This court has heretofore adjudicated the taxable values of vacant lands at Glen Pointe, the residential condominiums and the Loew’s Glen Pointe Hotel.
The issues in this case are the true value of the subject property and the application of chapter 123 (N.J.S.A. 54:51A-6 applicable to Tax Court proceedings), the statutory remedy for assessment discrimination.
*509 East Office Building.
Plaintiff seeks review of the following assessments:
1984 omitted 1985 1986 &
1984 added 1985 added 1987
Land $ 251,500 -0- $ 251,500 -0- $ 332,000
Impv. 13,506,000 7,840,000 15,436,000 7,840,000 19,199,000
Total $13,757,000 $1,960,000 $15,687,500 $7,840,000 $19,531,000 (prorated (prorated
3 months) 12 months)
The regular assessment for 1984, the omitted added assessment for 1984 and the added assessment for 1985 were all affirmed at the Bergen County Board of Taxation. The regular assessments for 1985, 1986 and 1987 were directly appealed to this court pursuant to N.J.S.A. 54:3-21.
The East Office Building is a seven-story office building of steel and masonry construction containing 247,869 square feet of floor area and sited on 1.006 acres of land. The edifice was built in 1983 to 1985. The rentable floor area amounts to 240,000 square feet. The lobby level includes a landscaped mall connecting the retail shops, the hotel and the health club. An enclosed pedestrian bridge off the second floor links the office building and the parking garage.
On October 1, 1983, the earliest assessing date, 24,843 square feet were under lease and completed with tenant fit-ups. The remaining 223,026 square feet were unfinished shell space. On October 1, 1984, the assessing date for tax year 1985, 176,215 square feet were leased, and on January 1, 1985, the effective date of the 1985 added assessment, 208,973 square feet were leased. On the assessing dates for 1986 and 1987 the building was more than 90% occupied and under lease.
The contract rent for all but seven tenants (out of 34) was fixed at $22 a square foot for all tax years in issue. Two tenants, Omni Resources and Ross Exploration, signed leases calling for $35 and $25 a square foot respectively. Omni *510 vacated in mid-1985 while Ross vacated in June 1986. Pepsi-Cola Bottling Co. and Haagen-Daz Co. executed leases in 1983 and 1984 for $21 a square foot. Three other tenants whose leases commenced in 1985 and 1986 agreed to pay $23.50 a square foot. Rent concessions were given to more than 50% of the tenants. These concessions were in the form of several months’ free occupancy. The time of the concessions varied. For some tenants, the rent-free occupancy commenced at the inception of the lease, while, for other tenants, the rent-free months were at the end of the lease. Still other leases called for free occupancy in non-consecutive months.
It was plaintiff’s practice to leave rental space in an unfinished shell condition until the space was leased, at which point tenant fit-ups were completed. Work letters specified the nature and extent of fit-ups (also referred to as finishes) to be provided by plaintiff. Other improvements were the responsibility of the tenants.
Fit-up expenditures over and above the amounts specified in work letters amounted to $720,392. The evidence does not reveal, however, how much of that amount was paid by the landlord and how much by the tenants. The evidence does disclose that the landlord assumed the excess fit-up expenditures in some instances as a rent concession.
Many of the tenants were national corporations or prominent local institutions, such as banks and insurance companies.
Plaintiff’s expert reached the following conclusions of value for the tax years involved:
*511 1984 $ 7,147,300
1985 14,872,200 [1]
15,921,500 1985 added
19,692,800 1986
21,302,900 1987
In reaching these conclusions he utilized the cost and income approaches to value, with principal reliance upon the latter. For the years 1984, 1985 and 1986 he made three negative adjustments to his income-derived value estimate: an estimated cost to finish, an allocation of the value of the parking garage and surface parking lots and a discount for a so-called absorption period, i.e., the time interval between completed construction and full occupancy. For 1987 the only adjustment was for the parking garage and surface parking lots.
The experts’ deduction for the cost to finish unrented shell space was based upon the percentage of unleased space on each assessing date (except for the assessing date for 1987). The cost figures were taken from the Marshall Valuation Service and the deduction was premised on inclusion in Marshall cost calculations of all tenant fit-ups, including partitioning, finished walls, finished ceilings, finished floor cover, electrical service and heating and cooling ducts.
His estimate of the true value of the parking garage was based upon the cost approach plus the value of the underlying land, for which he resorted to comparable land sales. His true value estimate of the service parking lots was also based upon comparable land sales. He allocated 64% of the garage value to the East Office Building for 1984, 44% for 1985 and 34.5% for 1986 and 1987. He allocated 80% of the value of the surface parking lots to the East Office Building for 1984, 51.8% for 1985 and 38.3% for 1986 and 1987.
The expert’s absorption period discount for 1984, 1985 and 1986 was based upon the total square feet of unleased space on the assessing dates, a posited three-year lease-up period and a present worth discount factor of 12%. He reasoned that the putative investor would take the state of lease-up into account *512 on each assessing date and apply a discount predicated on the time estimated to elapse before full occupancy was achieved.
His income approach presupposed a stabilized occupancy of 95%, economic rent of $21 a square foot for 1984 and 1985 and $22 a square foot for 1986 and 1987, based upon 12 office building leases in nearby taxing districts, expenses based upon an analysis of expenses incurred in 11 comparable office buildings in nearby municipalities and capitalization rates, exclusive of effective tax rates, of 13.44% for 1984 and 1985, 12.3% for 1986 and 11.4% for 1987. He utilized the band-of-investment, mortgage-equity method, with a 70% position assigned to the mortgage component and a 30% position assigned to the equity component. He posited a 20-year self-liquidating term for a direct reduction mortgage with an interest rate of 13% for 1984 and 1985, 11.5% for 1986 and 10.5% for 1987. He assumed an equity-dividend rate of 12% for 1984 and 1985, 11% for 1986 and 10% for 1987. The effective tax rates[2] were:
1984 3.28%
1985 3.12%
1986 2.19%
1987 2.57%
Thus, the expert’s value estimates are composed of the following:
*513 1984 1985 1986 1987
Value $21,153,400 $21,357,800 $24,433,700 $25,477,800
Cost to finish (8,292,200) (2,642,600) (775,800) —
Parking (3,166,700)* (3,256,100) (3,844,900) (4,174,900)
Absorption period discount (2,547,200) (586,900) (120,200) —
True value $ 7,147,300 $14,872,200 $19,692,800 $21,302,900
* This should be $3,514,100 according to the expert’s own appraisal. The allocation of $3,166,700 applies to 1983, a year not before the court.
The expert’s opinion of value for 1984 added-assessment purposes was the same as his 1985 value. His opinion of value for 1985 added-assessment purposes, using a January 1, 1985 valuation date, was $15,921,500. The differences between his January 1, 1985 value estimate and his value estimate as of October 1, 1984 for tax year 1985, were in the adjustments. His cost-to-finish deduction for January 1, 1985 was $1,305,900 based upon 31,027 square feet of unfinished shell space compared to 63,785 square feet of unfinished shell space on October 1, 1984. The allocation of the parking garage and lots is the same as that for 1986 ($3,844,900).
Defendant’s expert altered his value estimates for the East Office Building during the trial. He utilized the cost and market approaches to value for all years in issue; and he added the income approach for 1986 and 1987. While he purported to rely upon the cost approach in the two earlier years and made adjustments for entrepreneurial profit and the cost of tenant finishes, it appears that he ultimately relied upon stabilized, income-derived values for 1986 and 1987 and trended those values back to 1984 and 1985 on the basis of the percentage of completion of the East Office Building on the assessing dates for those years. Thus, his value estimate for 1986, predicated on the income approach, was $26,576,000 and, as the building was 85.29% complete on October 1, 1983, he applied that per *514 centage to $26,576,000 to arrive at a value estimate^ for 1984. The building was 95.65% complete on October 1, 1984, so he applied that percentage to his 1986 value estimate to arrive at a value estimate of $25,419,900 for 1985. His 1987 value estimate, also predicated upon the income approach, was $30,900,-000.
Like plaintiffs expert, he made negative adjustments to these “final” value estimates for the parking garage and the service parking lots. In this connection he accepted both the values and the percentage allocations made by plaintiffs expert.
Thus, defendant’s expert’s truly final value estimates for the East Office Building were:
1984 1985 1986 1987
Pinal value estimate $22,666,700 $25,419,900 $26,576,000 $30,900,000
Less garage & parking lots (3,514,100) (3,256,100) (3,844,900) (4,174,900)
Net value $19,152,600 $22,163,800 $22,731,100 $26,725,100
The expert made no separate valuations for the added assessments for 1984 and 1985.
His value estimates developed under the cost approach were only slightly lower than the values developed under the income approach for 1984, 1985 and 1986; the cost approach utilized for 1987 developed a value estimate approximately $3,500,000 less than the value developed by the income approach for that year, a variation of a little over 10%. There were only minor variations between the values developed by the market approach and the values developed by the income approach for all years in issue.

1984.

On October 1, 1983, the assessing date for 1984, only 10% of the East Office Building was leased and finished; the balance of the structure was unfinished shell space. The cost *515 approach is thus more reliable than the income or market data approaches. The estimates of rents and anticipated expenses are more tenuous than they would be for a completed, substantially occupied building; the market approach involves a meaningless comparison of completed buildings with a structure only 10% finished.
The experts are in virtual agreement on the cost value of the East Office Building. They differ on the land value and on a deduction for the cost to finish. Plaintiffs expert, relying upon eight vacant land sales, estimated the land value to be $200,000 an acre on October 1, 1983. Defendant’s expert, relying upon six vacant land sales, estimated the land value to be $11 a square foot of buildable office building on October 1, 1983. Defendant’s expert utilized a reliable unit of quantitative measurement, namely, the price per square foot of the office building to be constructed on the site of the comparable land sale. This method is self-adjusting for variations in acreage and building area. I find his value estimate of the land beneath the East Office Building to be the more persuasive. The probative value of an expert’s opinion depends upon the facts and reasoning offered in support of it. Dworman v. Tinton Falls, 1 N.J. Tax 445 (Tax Ct.1980), aff’d o.b. per curiam 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981).
Defendant’s expert, however, made no deduction for cost to finish. Given the incomplete state of construction of the East Office Building on October 1, 1983, this deduction, which plaintiff’s expert made, is not only appropriate, it is necessary, as the cost calculations taken from the manual are predicated upon a completed structure. Litton Business Systems, Inc. v. Morris Plains Boro., 8 N.J. Tax 520 (Tax Ct.1986), aff’d 9 N.J. Tax 651 (App.Div.1988).
Finally, plaintiff’s expert included entrepreneurial profit in his replacement cost estimate of the improvement, exclusive of the land. Sound appraisal practice as well as common sense dictate that the developer’s profit be calculated by taking into account his entire acquisition cost, not just the cost of the *516 improvements. Lawrence Associates v. Lawrence Tp., 5 N.J. Tax 481, 535 (Tax Ct.1983). See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed.1987) 373. I find from the credible evidence that 10% is a reasonable profit in this regard.
Thus, I find the true value of the East Office Building to be $10,962,900 on October 1, 1983, calculated under the cost approach as follows:
Basic structure cost, including architect’s fees $ 75.55/SF
Area 247,869 SF
Replacement cost of completed structure $18,726,500
Less cost to finish (8,292,157)
Replacement value — 10/1/83 $10,434,343
Land value — $11/SF x 247,869 SF 2,726,600
Entrepreneurial profit $ 1,316,094
Less value of garage and parking lot (3,514,100)
True value (rounded) $10,962,900
In reaching this conclusion of value as of October 1, 1983, for tax year 1984, I have considered and rejected the absorption-period discount posited by plaintiff’s expert for all tax years in issue. It is one thing to value an incomplete building by the cost approach, taking into account the cost to finish it. An unfinished building is not comparable to a finished building. It is another matter entirely, however, when using the income approach, to apply a discount for an estimated rent-up period to a structurally completed office building when another office building in the same municipality, comparable in all important respects, is valued without a discount because it is fully rented. Allowance of an absorption-period discount would result in a different value each year, depending on the level of occupancy. Occupancy levels, in the interests both of assessment uniformity and assessment stability, should be normalized and reflected in the vacancy allowance, which is a projection, on the valuation date, of the long-term quality and durability of *517 the property’s income stream. Newark v. 1013 Corp., 1 N.J.Tax 107 (Tax Ct.1980). The court concludes, therefore, that the expert’s absorption-period discount is contrary to the New Jersey Constitution (1947), Art. VIII, § 1, par. 1(a), which requires that all property be assessed in accordance with uniform rules and the same standard of value. The absorption-period discount for an office building is conceptually indistinguishable from the marketing discount rejected by this court on identical constitutional grounds in Glenpointe Assocs. v. Teanneck Tp., 10 N.J.Tax 288 (Tax Ct.1988) (sale of townhouse condominium units) and Tall Timbers, Inc. v. Vernon Tp., 5 N.J.Tax 299 (Tax Ct.1983) (sale of campsite condominium units).
I have also considered the technique employed by defendant’s expert in developing his final value estimate for 1984 by adjusting his income-derived value estimate for 1986 in accordance with the state of completion of the East Office Building on October 1, 1983. He valued the property at $26,576,000 on October 1, 1985, using the income approach. As the building was 85.29% complete on October 1, 1983 he applied that percentage to $26,576,000 to arrive at a value estimate of $22,666,-700 for October 1, 1983 (before adjustment for the parking garage and the parking lot). He employed the same technique in developing his value estimate for October 1, 1984 (for tax year 1985), when the building was 95.65% complete.
The technique is unsound. Property is to be valued as though sold on the assessing date, not according to its value on a subsequent date, discounted for time. N.J.S.A. 54:4-23. A purchaser is deemed to have made his decision as to the price he is willing to pay, and the seller is deemed to have made his decision on the price he will accept, on the basis of facts and circumstances known or reasonably foreseeable on the assessing date. Inwood at Great Notch v. Little Falls Tp., 6 N.J. Tax 316 (Tax Ct.1984). See New Brunswick v. State of N.J. Div. of Tax Appeals, 39 N.J. 537, 545, 189 A.2d 702 (1963).

*518
1985.

On October 1, 1984, the assessing date for 1985, 73% of the East Office Building was leased and finished; the balance was unfinished shell space. For the reasons stated above, I reject the income approach posited by defendant’s expert for 1985. In addition, I find that expert’s market data approach lacking in probative value. The comparable sale properties are all much smaller than the subject; there is no indication of the rents payable under the leases in the comparables; nor is there any indication of the tenancies; some of the comparable properties are not devoted to office rental; some, indeed, are owner-occupied. There is, thus, no opportunity for a meaningful comparison. The evidentiary value of the alleged comparables is vitiated. Venino v. Carlstadt, 1 N.J.Tax 172 (Tax Ct.1980), aff’d o.b. per curiam 4 N.J.Tax 528 (App.Div.1981).
In view of the fact that 27% of the East Office Building was unfinished shell space on October 1, 1984, I find the income approach a less reliable barometer of true value than the cost approach.
As with the 1984 tax year, the experts are in virtual agreement on the unadjusted reproduction cost of the building. They differ on land value and on the propriety of an adjustment for cost to finish. I find the land value posited by defendant’s expert to be the more persuasive, as he measures unit value on the basis of square footage of buildable area. Thus, the true value of the underlying land is $12 a square foot of buildable area on October 1, 1984.
As with 1984, plaintiff’s expert’s cost approach, adjusted for the cost to finish, provides the more reliable estimate of true value of the improvement. Both experts agree on the adjustment for the parking garage and parking lot.
For the reasons set forth above regarding 1984, an entrepreneurial profit of 10% is added to the entire cost, including land.
Accordingly, I find that the true value of the East Office Building on October 1, 1984 to be $19,232,200, calculated under the cost approach as follows:
*519 Basic structure cost, including architect’s fees $ 81.14
Area 247,869 SF
Replacement cost of completed structure $20,112,090
Less cost to finish ($ 2,642,613)
Replacement value — 10/1/84 $17,469,427
Land value — $12/SF x 247,869 SF 2,974,428
Entrepreneurial profit $ 2,044,390
Less value of garage and parking lot ($3,256,100)
$19,232,200 True value (rounded)

198b Added.

I find the true value of the East Office Building for 1984 added-assessment purposes to be the same as the true value hereinabove found for tax year 1985. The adjudication of the correct assessment will appear below.

1985 Added.

The 1985 added assessment is an obvious duplication of the 1984 omitted added assessment. The only difference is in the time proration. As there is abundant evidence from which the court may find true value for tax year 1985, the 1985 added assessment, prorated for the entire tax year, will be stricken. The county board should have stricken that assessment as erroneously duplicative pursuant to N.J.S.A. 54:4-54. Its failure to do so is error and the county board judgment is thus reversed.

1986.

As 92% of the rentable area of the East Office Building was leased and finished on October 1, 1985, the assessing date for 1986, the income approach is the most reliable indicator of true value. In this regard the experts are in accord on the economic rent of $22 a square foot, the leasable area of 240,000 square feet, a tenant electric contribution of 85$ a square foot and a 5% vacancy and loss allowance. They are a mere $73,000 apart on expenses, and this disagreement was resolved at the *520 trial, when the parties agreed to split the difference. Thus the only remaining area of substantial disagreement is the selection of the appropriate capitalization rate.
The parties agree that effective net income for tax year 1986 is $3,753,373. Plaintiff’s expert posits a capitalization rate, utilizing the band-of-investment, mortgage-equity technique of 12.3% plus an effective tax rate of 2.91% for an overall rate of 15.21%. He postulates a 70% mortgage position with a 20-year self-liquidating term at a fixed interest rate of 11.5%. His 30% equity position assumes an 11% cash-on-cash return.
Defendant’s expert, on the other hand, posits a capitalization rate, using the same technique, of 11.1% plus an effective tax rate of 2.91% for an overall rate of 14.01%. He assumes an 80% mortgage position with a 30-year amortization schedule and an interest rate of 11.5%. He postulates an 8% equity return.
Both experts rely upon the same copious data disseminated by the American Council of Life Insurance (ACLI). These data support the 70% mortgage position posited by plaintiff’s expert. The same data support the 30-year amortization schedule assumed by defendant’s expert. The experts agree on a mortgage interest rate of 11.5%
The most substantial divergence is found in the equity-dividend rate. In this regard the data support the equity-dividend rate of 8% posited by defendant’s expert.
Accordingly, I find from the credible evidence that the appropriate capitalization rate, including the effective tax rate, is 13.63%, composed as follows:
70% mortgage — 30 years @11.5% — constant 11.88% 8.32%
30% equity @8% 2.40%
Effective tax rate 2,91%
Total capitalization rate 13.63%
*521 Plaintiff’s expert also deducted $775,800 for the cost to finish, an adjustment which I find appropriate, as approximately 8% of the building was unfinished shell space on the assessing date. I also find that a reduction is in order for the garage and parking lots, with respect to which the experts are in agreement. This reduction is $3,844,900. For the reasons previously expressed, plaintiff’s absorption-period discount will be rejected.
In view of the foregoing I find the true value of the East Office Building on October 1, 1985, for tax year 1986, to be $22,916,900, composed of the following:
Net income capitalized @13.63% $27,537,600
Cost to finish (775,800)
Garage and parking lots (3,844,900)
$22,916,900

1987.

Both experts placed principal reliance on the income approach in estimating the true value of the East Office Building for tax year 1987. Plaintiff’s expert estimated the economic rent at $22 a square foot; defendant’s expert, relying upon the value of tenant fit-ups paid by the tenants, estimated economic rent at $23 a square foot. The expenses posited by the experts are virtually identical. Plaintiff’s expert assumes expenses of $1,650,558; defendant’s expert assumes expenses of $1,652,102. The court accepts the expenses postulated by plaintiff’s expert. Also, the experts agree on a tenant electric contribution of 85c a square foot and a vacancy and loss factor of 5%.
The basis for defendant’s expert’s economic rent of $23 a square foot is not supported by the evidence. There is no proof that the amounts expended by the tenants in excess of work-letter allowances paid by the owner add to the value of the property. Moreover, the trial testimony of defendant’s expert contradicted his own appraisal. At trial, he testified that fit-ups paid for by the tenants added to the property’s value; in his *522 appraisal he declared that those fit-up costs were not reflected in his value estimate. The probative value of an expert’s opinion depends upon the facts and reasoning offered in support of it. Dworman v. Tinton Falls, supra.
The economic rent estimate of plaintiff’s expert, on the other hand, is supported by the credible evidence, specifically, current contract rentals in the subject as well as current leases in comparable office buildings. I find the economic rent to be $22 a square foot for tax year 1987.[3]
The court therefore finds economic net income for tax year 1987 to be $3,559,242.
Before the court addresses the respective capitalization rates of the experts, another issue concerning the capitalization rate, which emerged during the trial, must be dealt with.
Defendant contended, through its expert and on brief, that the East Office Building and West Office Building must be viewed as a single investment unit, i.e., the putative investor would probably purchase both buildings as a package. Consequently, defendant argues, the magnitude of such an acquisition could best be handled by a large institutional investor, such as a life insurance company or a pension plan, either of which would pay all cash for the property, unaided by mortgage financing. These large investors would only be seeking an 8% return, which, defendant urges, should then be the capitalization rate.
The argument is not supported by the evidence. The two office buildings are sited on separately assessed lots; there is no proof that they constitute a single, indivisible economic unit. I will therefore deal with them as separate properties and evaluate the experts’ capitalization rates accordingly.
*523 As with tax year 1986 both experts rely upon the same copious ACLI data. For 1987 those data support defendant’s expert in his selection of interest rate, mortgage constant, and equity-dividend rate. The 70% mortgage position postulated by plaintiff’s expert is confirmed by the ACLI data. The experts agree on the effective tax rate.
Thus, I find the appropriate capitalization rate to be 12%, composed as follows:
70% mortgage @9.5% interest — 10.09% constant 7.06%
30% equity @8% 2.40%
Effective tax rate ($3.81 X 67.33%) 2.57%
12.00% (rounded)
In view of the above, I find the true value of the East Office Building on October 1, 1986, for tax year 1987, to be $25,485,-400, calculated as follows:
Economic rent $22/SF x 240,000 $ 5,280,000
Tenant electric contribution 85$/SF X 240,000 204,000
Gross potential income $ 5,484,000
Less vacancy and loss allowance — 5% 274,200
Effective gross income $ 5,209,800
Less expenses 1,650,558
Effective net income $ 3,559,242
Capitalized at 12% $29,660,350
Less garage and parking lots (4,174,900)
True value (rounded) $25,485,400

Discrimination.

Tax year 1984 was a revaluation year to which c. 123 (N.J. S.A. 54:51A-6) is inapplicable. The correct assessment for 1984 is thus the true value as hereinabove found, namely, $10,962,-900.
*524 As for the added assessment for the last three months of 1984, this court has determined that the value of the East Office Building on October 1, 1984, the effective date of the added assessment, is the same as the value for tax year 1985, namely, $19,232,200. The relevant statute, N.J.S.A. 54:4-63.3, directs that the excess of the property’s taxable value over the assessment made as of the preceding October 1 be assessed as an added assessment. Thus, the correct added assessment would appear to be $19,232,200 less $10,962,900 or $8,269,300, before proration, for the last three months of 1984.
However, the added assessment was a proration for three months based upon $7,840,000; and as defendant did not appeal its added assessment and c. 123 is inapplicable to 1984, the added assessment of $1,960,000 ($7,840,000 prorated for three months) will be affirmed. FMC Stores Co. v. Morris Plains Boro., 100 N.J. 418, 495 A.2d 1313 (1985).
The general average ratio promulgated by the Director, Division of Taxation for defendant for 1985 was 90.48%, the upper limit of the common level range was 100% and the lower limit of the range was 76.91%. The ratio of the 1985 assessment to the true value as hereinabove found is 81.57%. As this ratio falls within the common-level range, there will be no change in the assessment for 1985.
The general average ratio as promulgated by the Director for defendant taxing district for 1986 was 81.38%. The upper and lower limits of the common-level range were 93.59% and 69.17%, respectively. The ratio of assessment to true value as hereinabove found is 85.22%. As this ratio lies within the common-level range there will be no change in the 1986 assessment.
Finally, the general average ratio promulgated by the Director for defendant municipality for 1987 was 67.33%; the upper and lower limits of the common-level range were 77.43% and 57.23%, respectively. The ratio of assessment to true value as hereinabove found is 76.63%. As this ratio lies within the *525 common level range there will be no change in the 1987 assessment.

West Office Building.

Plaintiff seeks review of the following assessments pertaining to the West Office Building:
1983 1984 1986 1987
Land $334,700 $637,500 $ 622,600 $ 622,600
Impvts -0--0-23,390,000 23,390,000
Total $334,700 $637,500 $24,012,600 $24,012,600
The assessments for 1983 and 1984 were affirmed at the Bergen County Board of Taxation. The 1986 and 1987 assessments were directly appealed to this court pursuant to N.J.S.A. 54:3-21. Teaneck filed a counterclaim seeking an increase in the 1987 assessment. The taxpayer’s appeal for 1985 has been withdrawn.
The West Office Building is a seven-story office building containing a gross floor area of 329,429 square feet, of which 327,000 square feet is leasable. The building, completed in 1985, is of masonry and steel construction. It boasts a large entrance lobby and atrium, fountains, glass-enclosed automatic elevators and other amenities frequently associated with an attractive modern office building. The building is situated on 2.55 acres and it adjoins the East Office Building. As with the East Office Building, tenants in the West Office Building are entitled to park their motor vehicles in the nearby parking garage and in surface parking lots.
As of September 30, 1985, plaintiff expended $19,100,000 in both hard and soft costs and in land acquisition relative to the West Office Building. On October 25, 1985, plaintiff reported expenditures of final costs of $23,367,000, including land, parking areas, site development costs and all construction hard and soft costs.
*526 As of October 1, 1985 only seven offices, comprising 70,668 square feet, were under lease. The balance of the building was unfinished shell space. On October 1, 1986, 15 offices comprising 207,287 square feet, were under lease. All 15 leases, which were executed throughout 1985 and 1986 are for initial terms of ten years. All leases reflect rent concessions ranging from one month to two years rent-free occupancy. One lease involves an increase in tenant fit-up allowance.
Plaintiff followed the same practices regarding tenant fit-ups and work-letter allowances in both the East Office Building and West Office Building. Eleven tenants in the West Office Building spent approximately $5 million dollars on tenant improvements.
The contract rent, net of concessions for 1985 and 1986, ranged from $2.08 a square foot to $31.05 a square foot; the average was about $25 a square foot.
Plaintiffs expert estimated the true value of the West Office Building, and the vacant land before construction as follows:
1983 $ 382,500 ($150,000 an acre)
1984 510,000 ($200,000 an acre)
1986 15,267,100
1987 27,015,300
As with the East Office Building the expert’s final conclusions of value for 1986 and 1987 comprehended adjustments for the parking garage and surface parking lot, cost to finish and an absorption period discount. His value estimates for 1983 and 1984 were based upon vacant land sales which he found to be comparable to the subject. He placed primary reliance upon the income approach for 1986 and 1987, but he also utilized the cost approach, deriving his cost data from Marshall Valuation Service.
His land sales, eight in number, involved properties in Para-mus, Clifton, Montvale, Woodcliff Lake and Secaucus, all in reasonable proximity to Teaneck. The sale prices ranged from *527 $150,000 an acre to $311,526 an acre. All but two of the eight comparables were similar in size to the subject.
The expert’s income approach for 1986 and 1987 rests upon an assumption of $25 a square foot for economic rent for both years, a vacancy and loss allowance of 5% for both years and stabilized expenses of $2,390,803 for 1986 and $2,502,922 for 1987. He predicated his expense estimates on the actual operating experience of the East Office Building and the subject, and on operating expenses of eight other office buildings for the years 1983 through 1986.
To the effective net income thus derived he applied the band-of-investment method for both years. He posited a 70% mortgage position and a 30% equity position for both years. For 1986 he assumed a 20-year self-liquidating mortgage at 11.5% interest and an 11% cash-on-cash equity return. This produced a capitalization rate of 12.3% to which he added the 1986 effective tax rate of 2.91%. For 1987 he posited a 20-year, self-liquidating mortgage at 10.5% interest and a 10% equity return for a total capitalization rate of 11.4%, to which he added the effective tax rate of 2.57%.
From the true value estimate thus derived he subtracted an aliquot share of the value of the parking garage and parking lots, the cost to finish, computed using Marshall Valuation Service, and an absorption period discount for the rent-up period.
Plaintiff’s expert also utilized the cost approach, using Marshall Valuation Service; for land value which he estimated at $300,000 an acre for 1986 and $350,000 an acre for 1987, he relied upon the same eight vacant land sales which he utilized for the 1983 and 1984 land value estimates.
Defendant’s expert estimated the true value of the West Office Building and the vacant land before construction as follows:
*528 1983 $ 3,294,300 ($10/SF of proposed bldg.)
1984 3,623,700 ($11/SF of proposed bldg.)
1986 32,362,100
1987 40,312,200
The expert’s final conclusions of value for 1986 and 1987 comprehended adjustments for the parking garage and surface parking lot as well as the cost to finish the unfinished shell space. His value estimates for 1983 and 1984 were supported by the same vacant land sales employed in his land value estimates for the East Office Building. His methodology was also the same, i.e., he estimated value on the basis of total square footage of the anticipated office building.
In developing true value estimates for 1986 and 1987, the expert relied upon all three approaches to value, with primary reliance upon the income approach. In reaching his final value estimates under the income approach he predicated his 1986 value conclusion on his 1987 valuation, and applied a percentage to the latter figure on the basis of the extent of completion of construction on October 1, 1985. This was the same technique he employed in valuing the East Office Building.
He agreed with plaintiff’s expert on economic rent (although he postulated the tenant electric contribution at $1 a square foot compared to 85$ a square foot utilized by plaintiff’s expert) and on a 5% vacancy and loss allowance. He posited expenses of $1,935,840, stabilized, for 1986 and $2,249,760, stabilized, for 1987.
To the economic net income thus derived he applied the band-of-investment method, positing positions of 80% mortgage and 20% equity for both years. For 1986 he assumed a 30-year mortgage at 11.5% interest and an equity dividend of 8%, producing a capitalization rate of 11.10%, to which he added the effective tax rate of 2.91%. For 1987 he assumed a 30-year mortgage at 9.5% interest, and an equity dividend of 8%, *529 producing a capitalization rate of 9.67%, to which he added the effective tax rate of 2.57%.
The expert also utilized the cost approach, employing Marshall Valuation Service. He made a deduction for the cost to finish under all three approaches, but he departed from Marshall in this regard and relied upon Black’s Guide and conversations with other builders to arrive at a cost to finish deduction of $12 a square foot. For land value he resorted to the same comparables and applied the same methodology, i.e., the square footage of buildable structure, as he utilized in developing land value estimates for 1983 and 1984.
The expert’s market data approach involved ten sales of office buildings in some proximity to the subject. The sales involved parcels ranging in size from 1.5 acres to 16.5 acres and buildings of 56,000 square feet to 186,421 square feet. The sales took place in 1983, 1984 and 1985.
The experts are in accord on both the value of the parking garage and surface parking lots and on the aliquot share thereof to be deducted in the valuation of the West Office Building for 1986 and 1987.

1983 and 1984.

As with the land valuation issue in the case of the East Office Building, the approach of defendant’s expert is more probative. He uses a reliable unit of quantitative measurement, which automatically adjusts for variations in acreage and building area. I, thus, find the true value of the vacant land to be $3,294,300 on October 1, 1982 and $3,623,700 on October 1, 1983.

1986.

Although only 70,668 square feet were leased on October 1, 1985, the assessing date for 1986, the West Office Building was substantially completed on that date, except for unfinished office space awaiting execution of leases. Final cost expenditures of $23,367,000 were reported by plaintiff on October 25, 1985 a little more than three weeks after the assessing date. The property is thus sufficiently advanced in terms of *530 readiness for occupancy to be valued under the income approach, the method preferred for income property. Helmsley v. Fort Lee, 78 N.J. 200, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979); Fort Lee v. Hudson Terrace Apts., 175 N.J.Super. 221, 417 A.2d 1124 (App.Div.1980); G & S Co. v. Eatontown, 2 N.J.Tax 94 (Tax Ct.1980), aff’d o.b. per curiam 6 N.J.Tax 218 (App.Div.1982). The court thus concludes that the West Office Building will be valued pursuant to the income approach for 1986.
The experts agree on economic rent of $25 a square foot, on tenant electric contribution of 85$ a square foot and on a 5% vacancy and loss allowance. They differ on operating expenses and the choice of the appropriate capitalization rate.
Plaintiffs operating expenses of $2,390,803 are convincingly supported by the recent operating expense history of nine office buildings in nearby communities. Defendant’s expert, on the other hand, assumes the expenses of the West Office Building to be identical on a square-foot basis, to the East Office Building. His assumption is not sound. The West Office Building has features which the East Office Building lacks, such as fountains, an atrium and a glass-enclosed elevator. These features clearly contribute to a higher maintenance level.
Accordingly, I find the 1986 operating expenses to be $2,390,-803, the amount posited by plaintiff’s expert. The economic net income is therefore $5,639,499.
Both experts developed the same capitalization rates utilized in their appraisals for the East Office Building. Thus, the determinations hereinabove made with respect to that property apply to the West Office Building as well. The capitalization rate for 1986 is 13.63%, including the effective tax rate of 2.91%.
The market data approach proferred by defendant’s expert is lacking in probative utility. None of the comparable buildings remotely approaches the West Office Building in size; the land size of all but two of the comparables is vastly larger than the *531 acreage of the West Office Building, and defendant’s expert offered no data concerning the leases in the comparables. The alleged comparables simply do not admit of reasonable comparison. Venino v. Carlstadt, supra.
The only remaining item in dispute is the cost to finish. Plaintiff’s expert utilized the Marshall Valuation Service, while defendant’s expert purported to rely upon several different sources, only one of which (Black’s Guide) was documented and subject to cross-examination. The source utilized by plaintiff’s expert is an authoritative, generally accepted cost manual relied upon by many valuation experts. I find the cost to finish calculations of plaintiff’s expert to be highly probative and they will be used in computing the cost-to-finish adjustment.
In view of the foregoing I find the true value of the West Office Building on October 1, 1985, for tax year 1986, to be $23,261,800, determined as follows:
Effective net income of $5,639,499 capitalized @13.63% $41,375,600
Less:
Cost to finish ($12,875,500)
Parking garage and lots ($5,238,300)
True value $23,261,800
For the reasons heretofore given the court does not accept plaintiff’s expert’s absorption-period discount.

1987.

For the reasons given above regarding 1986 the court finds the income approach to be the most probative valuation approach for 1987.
Again, the experts agree on economic rent of $25 a square foot. They differ, however, on the tenant electric contribution. The data set forth in detail in the appraisal of defendant’s expert showing tenant electric charges paid by the 15 tenants who were in occupancy in 1986 and 1987, and who occupied over 210,000 square feet of office space, indicate the payment to the landlord of 85<t a square foot for electricity. Thus, the court *532 accepts the assumption of plaintiff’s expert that electric charges amount to 85<t a square foot.
As with 1986, the experts agree on a 5% vacancy and loss allowance. They continue to differ on expenses. For the reasons stated above regarding 1986 the court accepts the amount posited by plaintiff’s expert.
Effective net income is thus $5,527,380. The capitalization rate, for the reasons expressed above regarding the East Office Building, is 12%, including the effective tax rate of 2.57%.
For the reasons heretofore expressed, I accept the cost to finish adjustment preferred by plaintiff’s expert and I reject the market data approach submitted by defendant’s expert.
In view of the foregoing, I find the true value of the West Office Building on October 1, 1986, for tax year 1987, to be $34,831,000, calculated as follows:
Effective net income of $5,527,380 capitalized @12% $46,061,500
Less:
Cost to finish ($5,542,700)
Value of parking garage and lots (5,687,800)
True Value $34,831,000

Discrimination.

The general average ratio promulgated by the Director, Division of Taxation for Teaneck for 1983 was 71%; the upper and lower limits of the common-level range were 82% and 60%, respectively. The ratio of the assessment to the true value as herein found for 1983 is 10.15%, well below the lower limit of the common range. I am thus required by the mandate of N.J.S.A. 54:51A-6 to increase the 1983 assessment by applying the general average ratio to the true value. Application of N.J.S.A. 54:51A-6 is automatic; and, where warranted by the court’s finding of true value, an assessment must be increased whether or not a counterclaim has been.filed seeking an increase. Weyerhaeuser Co. v. Closter Boro., 190 N.J.Super. *533 528, 464 A.2d 1156 (App.Div.1983); Devonshire Development Asso. v. Hackensack, 184 N.J.Super. 371, 2 N.J. Tax 392, 446 A.2d 201 (Tax Ct.1981); Abe Schrader Corp. v. Secaucus, 8 N.J. Tax 390 (Tax Ct.1986).
The assessment will therefore be $2,338,900, all allocable to land.
Tax year 1984 was a revaluation year to which N.J.S.A. 54:51A-6 (e. 123) does not apply. The defendant taxing district failed to file a timely appeal seeking an increase in the assessment. Thus, the assessment of $637,500, all allocable to land, will be affirmed, notwithstanding this court’s finding of true value in excess of the assessment. FMC Stores Co. v. Morris Plains Boro., supra.
The general average ratio promulgated by the Director for Teaneck for 1986 was 81.38%; the upper and lower limits of the common-level range were 93.59% and 69.17% respectively. The ratio of assessment to true value as herein found is in excess of 100%. Plaintiff is thus entitled to relief by application of the general average ratio to the true value. The 1986 assessment will therefore be:
Land $ 473,200
Improvements 18,457,200
Total $18,930,400
The general average ratio promulgated by the Director for Teaneck for 1987 was 67.33%; the upper and lower limits of the common-level range were 77.43% and 57.23% respectively. The ratio of assessment to true value as herein found is 68.94%, which is within the common level range. Accordingly, the 1987 assessment will be affirmed.

The Parking Garage and Surface Parking Lots.

A. Parking Garage (Block 3712, Lot 22)
The following assessments for the parking garage are under appeal:
*534 1984 Added 1985 1985 Added 1986
Land $ -0-$1,404,600 $ -0- $ 1,714,600
Impvts 1,223,700 6,118,400 5,284,000 9,549,000
Total $1,223,700 $7,523,000 $1,761,600 $11,263,600
(prorated (prorated
12 months) 4 months)
Teaneck appeals the county board judgment cancelling the 1984 added assessment. The taxing district submitted no proofs on this issue. The court is thus unable to determine either true value or the effective date for the added assessment. The Bergen County Board of Taxation is thus affirmed on the 1984 added assessment and the same is cancelled.
Plaintiff seeks direct review of the 1985 and 1986 regular assessments pursuant to N.J.S.A. 54:3-21. Plaintiff appeals from the county board judgment affirming the 1985 added assessment.
The parties agree that the appraisals submitted by plaintiffs expert reflect the true value of the parking garage for all periods under review. Those values are:
1985 $ 5,128,700
1985 added 9,562,200 (total value on 9/1/85)
1986 10,124,000
The court finds the true value for the indicated periods to be the values submitted by plaintiffs expert as set forth above.
As the true value for 1985 (before the addition completed during August 1985) is less than the assessment, plaintiff is entitled to relief under N.J.S.A. 54:51A-6 by application of the . average ratio of 90.48% to the true value. The correct regular assessment for 1985 will therefore be:
*535 Land $ 867,700
Improvements 3,772,700
Total $4,640,400
The true value of the parking garage on September 1, 1985, the effective date of the 1985 added assessment, was $9,562,-200, which exceeds the value on October 1, 1984 by $4,433,500. The general average ratio (90.48%) is applied to the latter, resulting in an added assessment for a full year of $4,011,300. For four months the added assessment becomes $1,337,100.
The 1986 assessment exceeds the true value of the property. Plaintiff is thus entitled to relief under N.J.S.A. 54:51A-6 by applying the average ratio of 81.38% to the true value. The 1986 assessment thus becomes:
Land $1,253,900
Improvements 6,985,000
Total $8,238,900
B. The Surface Parking Lots (Block 3720, Lot 1)
The following assessments are under appeal:
1983 1985 1986 1987
Land $350,300 $533,800 $651,600 $651,600
Impvts -0--0--0--0-
Total $350,300 $533,800 $651,600 $651,600
Plaintiff appeals from county board judgments affirming the 1983, 1986 and 1987 assessments. Plaintiff seeks direct review of the 1985 assessment.
The parties agree that the appraisals submitted by plaintiffs expert reflect the true value of the subject property. Plaintiffs expert lumps Lots 1 and 21 together in his appraisal. This seems to be erroneous, as no papers filed in this lengthy, complex proceeding refer to Lot 21. Accordingly, the appraisal will be deemed to refer to Block 3720, Lot 1 only.
*536 Plaintiff’s expert estimated the true value of the subject property to be as follows:
1983 $ 459,700
1985 674,300
1986 919,500
1987 1,072,700
The court finds the true value of the property to be as estimated by plaintiff’s expert.
The 1983 assessment is 76.2% of the property’s true value for that year. The general average ratio for Teaneck for 1983 was 71%; the lower and upper limits of the common-level range were 60% and 82%, respectively. As the ratio of assessment to true value lies within the common-level range there will be no change in the assessment for 1983.
The 1985 assessment is 79.16% of the property’s true value for that year. The general average ratio for Teaneck for 1985 was 90.48%; the lower and upper limits of the common-level range were 76.91% and 100%, respectively. As the ratio of assessment to true value lies within the common-level range, the 1985 assessment will not be changed.
The 1986 assessment is 70.86% of the property’s true valué for that year. The general average ratio for Teaneck for 1986 was 81.38%; the lower and upper limits of the common-level range were 69.17% and 93.59% respectively. As the ratio of assessment to true value lies within the common-level range the 1986 assessment will not be changed.
The 1987 assessment is 60.74% of the property’s true value for that year. The general average ratio for Teaneck for 1987 was 67.33%; the lower and upper limits of the common-level range were 57.23% and 77.43%, respectively. As the ratio of assessment to true value lies within the common-level range the 1987 assessment will not be changed.
Judgments will be entered in accordance with this opinion.

The expert’s opinion of value for 1984 added-assessment purposes was the same as his opinion of value for 1985.

The rates shown in the text are based upon application of the c. 123 ratios to the actual tax rates (100% for 1984, a revaluation year). The expert also calculated the effective tax rate by application of the unweighted, unclassified ratio to the actual tax rate. For the reasons given in an earlier opinion in the Glen Pointe cases, the court rejects the unweighted, unclassified ratio for all purposes in the instant case. Glenpointe Assocs. v. Teaneck Tp., 10 N.J.Tax 288, 306-307 (Tax Ct.1988).

The finding of economic rent reflects rent concessions, which are supported by comparable lease? proferred through plaintiff's expert as well as current leases in the subject property itself.