

TAX COURT MANAGEMENT OFFICE
(609) 815-2922
0972

P.O. Box 972
TRENTON, NEW JERSEY 08625-

# Corrected Opinion Notice

## Date: February 27, 2026

C. Justin McCarthy, Esq
125 Half Mile Road Suite 300
Red Bank, NJ, 07701

Scott W. Kenneally, Esq.
401 Chambers Bridge Rd.
Brick, NJ, 08723

**From: Naglaa Elsayed     Telephone number:  (609)815-2922**

**Re:  G S REALTY CORP V BRICK TOWNSHIP**
**Docket number: 009174- 2020**

The attached corrected opinion replaces the version released on February 27, 2026   The **Opinion has been corrected as noted below:**

Corrected February 27, 2026 -Page 1, to add the stamp " Approval for Publication In the New Jersey Tax Court Reports.

-------------------------------------------------------x

G.S. REALTY CORP.,               :

                                 :    TAX COURT OF NEW JERSEY

          Plaintiff,      :    DOCKET NO: 009174-2020

                                 :             005103-2021

         v.                  :

                                 :

TOWNSHIP OF BRICK,       :

                                 

| Approved for Publication |
| In the New Jersey |
| Tax Court Reports |

                     :

          Defendant.     :

-------------------------------------------------------x

Decided February 26, 2026.

C. Justin McCarthy and Steven W. Ward for G.S. Realty Corp. (Giordano, Halleran & Ciesla, P.C., attorneys).

Scott W. Kenneally for Township of Brick (Starkey, Kelly, Kenneally, Cunningham, Turnbach & Yannone, attorneys).

CIMINO, J.T.C.

Plaintiff G.S. Realty (GS) developed a phased expandable condominium project in accordance with Federal National Mortgage Association (FNMA or Fannie Mae) guidelines. Phasing precludes a developer from shifting the expenses of unannexed, yet to be developed, phases to condominium unit owners. This reduces mortgage loan defaults by unit owners. Fannie Mae phasing helps open the

door to preferred financing for unit purchasers, which in turn enhances the marketability of the units for developers. A master deed recorded by GS's predecessor in title guided the phased expansion of the condominium.

With GS annexing phases as the condominium progressed, the tax assessor assessed the annexed phases to the unit owners. The assessor assessed the unannexed phases to GS. GS asserts that the unannexed phases are taxable to the unit owners. GS has filed for summary judgment essentially seeking a refund of the taxes it paid on the unannexed phases.

GS argues that New Jersey's condominium taxing statute, N.J.S.A. 46:8B-19, obligates unit owners to pay the taxes for the unannexed phases. The statute is based upon a Federal Housing Administration (FHA) model act. As a condition for broadening the availability of condominium mortgage insurance in the state, FHA mandated the enactment of the statute. The statute limits each unit owner's taxes on the common elements to a proportionate share. GS claims the common elements include the unannexed phases.

Despite Fannie Mae phasing and the FHA-inspired taxing statute guarding against mortgage loan defaults, GS urges the court to interpret the two provisions in a way that enhances default risk by increasing the financial responsibility of unit owners. Such interpretation is contrary to Fannie Mae and FHA policy goals of encouraging home ownership as well as the phasing provisions of the master deed

2

establishing the condominium. The unannexed phases do not constitute condominium common elements. Thus, the assessor appropriately assessed the unannexed phases to GS.

I.

The property in question is located on Block 701, Lot 9.05 of the tax map of the Township of Brick. A prior developer obtained municipal zoning and planning approvals to construct 170 condominium units, later reduced to 168 units, on twenty-one acres. The prior developer planned to complete the project in twenty-three phases. Each phase consisted of a single building with five to seventeen residential units.

The prior developer recorded a master deed in 2014. The introductory language of the master deed declared the condominium as the land encompassing Lot 9.05 along with any improvements. The master deed also defined the terms "property," "condominium" and "common elements" at sections 2.14, 2.32 and 5.01(a), respectively, to include the land encompassed by Lot 9.05. The introductory and definitional language of the master deed tracks the generic boilerplate master deed language found in a New Jersey treatise on condominium association law. See Wendell A. Smith & Dennis A. Estis, New Jersey Condominium and Community Association Law §§ 6:1, 6:2.30, 6:2.12, 6:15.01(a) (1996); Wendell A. Smith,

3

Dennis A. Estis & Christine F. Li, New Jersey Condominium and Community Association Law §§ 6:1, 6:2.31, 6:2.12, 6:5.01(a) (2025).

Without any further language, filing the master deed would have created all 170 units at once, albeit unbuilt. However, the availability of Fannie Mae preferred financing requires the sale of fifty percent of the units. As explained by GS, creation of all the units at once would have impaired the ability of unit buyers to obtain preferred financing. This preferred financing includes not only the greater availability of mortgage loan funding, but the availability of lower interest rates and down-payments.

Phasing enables more units to qualify for Fannie Mae financing sooner. To that end, the master deed includes the following language creating an expandable condominium:

> 3.01 The Condominium. . . . Upon the recordation of this Master Deed, only the lands and Units situated in Phase 1, comprised of a total of five (5) units, in Building No. 1 . . . shall be annexed to the Condominium. (emphasis added).

The master deed further provides:

> 3.01 [sic] Changes to the Condominium. Sponsor reserves the right, in its sole discretion, to annex the remaining lands and Units contemplated by this Master Deed. . . . No approval of the Association, any Unit Owner(s) or any Eligible Mortgage Holder(s) shall be required in order to expand the Condominium in this manner. (emphasis added).

4

The percentage interest schedule detailed in Exhibit F of the master deed provides the:

> . . . Condominium is an expandable condominium which, when and if fully constructed, will consist of a maximum of one hundred seventy (170) Units. As the Units are built and completed, they will be annexed to the Condominium upon the recordation of amendment to the Master Deed in the Office of the Ocean County Clerk . . . .

The master deed goes on to detail a building-by-building phasing plan to annex the additional phases to the condominium. The master deed includes a map entitled "Condominium Phasing Plan for FHA and FNMA Project Approvals" showing the building areas constituting each phase.

With just the first phase, the assessor assessed each of the initial five units as the value of the unit itself and each unit's percentage share of the common elements. Each unit owner had a one-fifth interest in the common elements. The assessor assessed the unannexed portion of the parcel to the prior developer.

From 2014 through 2016, the prior developer recorded four separate amendments to the master deed annexing additional phases. When the prior developer annexed a phase, the assessor placed the units in the phase on the tax rolls, including each unit's share of the common elements, and decreased the assessment on the remaining unannexed portion of the parcel. The prior developer annexed a

5

total of four additional buildings in four phases totaling twenty-eight units.[1] This brought the total to thirty-three units. Each unit owner had a 1/33rd interest in the common elements which consisted of the annexed phases. The prior developer retained its interest in the unannexed phases.

In early 2017, the recording of a deed-in-lieu of foreclosure transferred the unannexed lands from the prior developer to GS. The deed-in-lieu apparently arose from a loan GS made to the prior developer and secured by a 2006 mortgage. The deed transferred Lot 9.05 to GS except for the interests of the thirty-three unit owners. In other words, the deed only transferred the unannexed portions to GS.

From 2018 through 2021, GS recorded eight amendments to the master deed annexing a total of twenty additional buildings in twenty phases totaling 135 units.[2,3] Once again, when GS annexed a phase, the assessor placed the units in the phase on the tax rolls, including each unit's share of the common elements, and decreased the assessment on the remaining unannexed portion of the parcel.

The annexation of 168 units completed the project in 2021. Each unit's assessment consisted of the unit itself along with a 1/168th interest in the common

---

[1] The Second through Fifth Amendments to the master deed.

[2] As found in the Sixth though Fifteenth Amendments to the master deed.

[3] When GS took over, it reduced the total from 170 to 168 by splitting two buildings in half eliminating a unit in each. This split also added two more phases.

elements. No unannexed portions of Lot 9.05 remained. No longer was there an assessment for the unannexed portion.

## II.

### A.

This matter comes before the court on GS's motion for summary judgment. The court must assess "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

### B.

The condominium form of ownership overcomes a centuries-old common law limitation on real property ownership. "At the common law the rule was that ownership of the surface imported ownership of an indefinite extent, upwards and downwards." Toth v. Bigelow, 1 N.J. 399, 404 (1949). This common law rule does not work well when multiple units share the same parcel of land. The 1963 Horizontal Property Act allowed ownership not based on traditional common law concepts. L. 1963, c. 168. The 1963 Act addressed unit ownership in high-rise buildings. See N.J.S.A. 46:8A-2(a). The 1970 Condominium Act followed with other forms of common ownership such as townhouses, garden apartments and

7

single-family homes.  L. 1969, c. 257.  See N.J.S.A. 46:8B-3(d)(iii), (o).  Both acts define what has become to be known as horizontal property rights.

Horizontal property rights differ from traditional fee simple ownership.  There is not sole ownership of the land to "an indefinite extent, upwards and downwards."  Instead, a "unit owner has a fee simple title to and enjoys exclusive ownership of his or her individual unit while retaining an undivided interest as a tenant in common in the facilities used by all of the other unit owners."  Fox v. Kings Grant Maint. Ass'n, Inc., 167 N.J. 208, 219 (2001).  See also N.J.S.A. 46:8B-6.  These common facilities, known as common elements, include the land around and under the units as well as common improvements such as sidewalks, roadways and parking lots.[4]  N.J.S.A. 46:8B-3(d).  Each unit owner must pay a proportionate share of the common expenses.  N.J.S.A. 46:8B-17.

A developer creates a condominium by recording a master deed with the county recording officer.  N.J.S.A. 46:8B-8.  The master deed can allow amendments.  N.J.S.A. 46:8B-11.  The master deed, and amendments thereto, describe the lands upon which the condominium is located, identify each unit, describe the common elements and establish the percentage interest each unit owner

---

[4]  The 1970 Condominium Act also allows limited common elements, such as a common entrance foyer that only serves a limited number of the units in which the rights are limited to certain unit owners.  N.J.S.A. 46:8B-3(k).

8

has in the common elements. N.J.S.A. 46:8B-9. Once the master deed or an amendment creates a unit, a developer can transfer the unit, along with its proportionate share of the common elements, to a unit buyer in the same way as any other property. N.J.S.A. 46:8B-10.

A local tax assessor assesses each unit owner for the value of the individual unit along with a proportionate percentage share of the common elements.[5] N.J.S.A. 46:8B-3(o), -19. Taxes are "separately assessed against and collected on each unit as a single parcel, and not on the condominium property as a whole." N.J.S.A. 46:8B-19. This statutory tax assessment provision is at the heart of GS's argument that it is not responsible for the taxes on the unannexed areas. GS claims that the common elements include all twenty-one acres of Lot 9.05, whether annexed or not. Thus, GS argues that separately assessing the unannexed portion of the parcel is improper. GS wants a refund of the taxes it paid on the unannexed portion of Lot 9.05.

## C.

The two pillars of United States housing policy are credit programs and securitization. Sarah L. Quinn, <u>American Bonds: How Credit Markets Shaped a Nation</u> 2-5 (2019). The goal is to encourage home ownership. <u>Id.</u> at 142, 175.

---

[5] <u>See</u> Appendix, <u>infra,</u> for text of pertinent parts of the 1963 Horizontal Property Act and the 1970 Condominium Act.

9

Credit programs include FHA mortgage insurance which pays a lender for losses in the event of mortgage loan default. 12 U.S.C. § 1710.

Securitization is provided by Fannie Mae which purchases the mortgage loans from lenders and packages the loans into bond-like investments known as mortgage-backed securities. Darryl E. Getter, Cong. Rsch. Serv., R46746, Fannie Mae and Freddie Mac: Recent Administrative Developments 1 (July 19, 2024). This increases the liquidity or availability of loans. As a requirement for a lender to sell a conventional condominium mortgage loan to Fannie Mae, the developer must have sold fifty percent of the units.[6] FNMA, Selling Guide B4-2.2-03 (Aug. 6, 2025). Fannie Mae phasing enables a developer to more rapidly reach the fifty-percent threshold. The developer only has to sell fifty percent of the annexed units, instead of fifty percent of the total. Ibid.

Both programs are rooted in the collapse of the mortgage market at the onset of the Great Depression.[7] American Bonds 139-42. The federal government's

_____

[6] Conventional mortgages do not have FHA or other governmental credit protections, but may have private mortgage insurance. See 12 U.S.C. § 1717(b)(2). The Veterans Administration and the United States Department of Agriculture also offer government sponsored mortgage insurance. 38 U.S.C. § 3703, 42 U.S.C. § 1472(h).

[7] The history of the federal government's involvement in the housing market spans decades. In 1926, the housing market stalled. Id. at 139. By the 1929 stock market crash, foreclosures had doubled. Ibid. By 1933, foreclosures had doubled again. Ibid. Lenders were reluctant to lend. Id. at 142. To restore confidence, the National Housing Act of 1934 authorized FHA mortgage insurance and the chartering of

national mortgage associations to purchase mortgages from lenders.  Id. at 141-43. Pub. L. No. 73-847, §§ 203, 301, 48 Stat. 1246, 1248-49, 1252-54 (codified as amended at 12 U.S.C. §§ 1709, 1716).

While lender confidence improved with FHA mortgage insurance, liquidity problems persisted.  American Bonds 142, FNMA, Background and History 2 (1975 ed.).  Fannie Mae commenced operations in 1938 and started purchasing FHA insured mortgages from lenders.  Lightfoot v. Cendant Mortg. Corp., 580 U.S. 82, 85 (2017).  This freed up funds so that lenders could lend to others.  After receiving congressionally appropriated start-up funds, Fannie Mae issued debt to raise more funds.  43 Fed. Reg. 36200, 36201 (Aug. 15, 1978).

The Housing Act of 1961 expanded FHA insurance to condominiums.  Pub. L. No. 87-70, § 234, 75 Stat. 149, 160 (codified as amended at 12 U.S.C. § 1715y). For condominium purchasers to be eligible, states had to adopt provisions for the separate assessment of each unit.  24 C.F.R. 234.26(d)(3) (1962).  See also 24 C.F.R. § 234.26(d)(3) (2025).

With an eye towards privatization, Congress revised Fannie Mae's charter in 1954.  Housing Act of 1954, Pub. L. No. 83-560, § 201, 68 Stat. 590, 613 (codified as amended at 12 U.S.C. § 1718).  The Housing and Urban Development Act of 1968 implemented a plan for the privatization of Fannie Mae.  Pub. L. No. 90-448, § 802, 82 Stat. 476, 536 (codified as amended at 12 U.S.C. §§ 1716 through 1723a). The 1968 Act spun off certain Fannie Mae operations.  Ibid.  The Government National Mortgage Association, otherwise known as Ginnie Mae, would handle special assistance to the market and managing outstanding debt.  Ibid.  Fannie Mae would continue to handle the secondary market operations of purchasing loans from lenders to increase liquidity.  Ibid.

The Emergency Home Finance Act of 1970 permitted Fannie Mae to purchase conventional mortgages.  Pub. L. No. 91-351, § 201, 84 Stat. 450 (codified as amended at 12 U.S.C. § 1717(b)).  The conventional mortgage program commenced operations in 1972.  Background and History 10-11.  Fannie Mae expanded the conventional mortgage program in 1974 to include condominiums.  Id. At 12. Previously, Fannie Mae purchased FHA insured condominium mortgage loans.  12 U.S.C. §§ 1715y(g), 1717(b)(1).

The 1970 Act also created the Federal Home Loan Mortgage Corporation, otherwise known as Freddie Mac, which traditionally purchased loans from federal savings associations otherwise known as thrifts.  Pub. L. No. 91-351, §§ 301 through 310, 84 Stat. at 451-58 (codified as amended at 12 U.S.C. §§ 1451 through 1459). Congress harmonized the missions of Fannie Mae and Freddie Mac in 1989. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 731(e)(2), 103 Stat. 183, 433 (codified as amended at 12 U.S.C. § 1454).

involvement in the housing market has remained extensive over the succeeding decades.  See supra notes 6,7.

III.

The language of the master deed, the course of dealing of the prior developer and GS, and the policy behind Fannie Mae phasing and the FHA tax assessment provisions undercut GS's assertion that the unannexed phases are part of the common elements.

A.

The master deed establishes the relationship between a developer and the unit owner.  See generally N.J.S.A. 46:8B-8, -9.  Basic principles of contract interpretation apply to master deeds. See Cooper River Plaza E., LLC v. Briad Grp., 359 N.J. Super. 518, 527 (App. Div. 2003) ("[Deed restrictions] must be analyzed in accordance with the principles of contract interpretation . . . .").  "Interpretation of a master deed is . . . a question of law."  High Point at Lakewood Condo. Ass'n, Inc. v. Township of Lakewood, 442 N.J. Super. 123, 133 (App. Div. 2015).  Like

---

While nominally private, Fannie Mae enjoys privileges not shared by other private entities such as exemption from most state and local taxes.  12 U.S.C. § 1723a(c)(1).  Congress empowered the federal government to step in if Fannie Mae cannot achieve its objectives.  12 U.S.C. § 4617.  After the mortgage loan industry collapsed in 2008, the government placed Fannie Mae in the conservatorship of the Federal Housing Finance Agency.  75 Fed. Reg. 39462, 39463 (July 9, 2010).  Overall, the history of both Fannie Mae and the FHA demonstrate the federal government's commitment to facilitating home ownership.

any other contract, a master deed "must be read as a whole, in 'accord with justice and common sense.'" Cumberland Cnty. Improvement Auth. v. GSP Recycling Co., 358 N.J. Super. 484, 497 (App. Div. 2003) (quoting Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956)).

The master deed established an expandable condominium implementing Fannie Mae phasing. Only annexed "lands and [u]nits" are part of the condominium. Thereafter "[s]ponsor reserves the right . . . to annex the remaining lands and [u]nits . . . ."

The filing of the master deed created the first phase of the condominium. The common elements comprised "only the lands . . . situated in Phase 1." The prior developer continued to own "the remaining lands" of Lot 9.05 not annexed to the condominium. [8]

Phases were "annexed to the Condominium upon the recordation of amendment[s] to the Master Deed . . . ." While the annexation of phases diluted the existing owner's percentage of common element interest, the area comprising the common elements increased with the addition of phases. The prior developer, and later GS, owned the unannexed balance of Lot 9.05.

---

[8] Hence, the master deed refers to remaining units not annexed. While the units did not exist until annexed, the prior developer did have the ability to annex units to the condominium.

This process continued until there were twenty-five phases annexed to the condominium for a total of 168 units over twenty-five buildings. With the annexation of the last phase, all of Lot 9.05 consisted of the common elements with each unit owner having a 1/168th interest. There were not any unannexed areas remaining.

The plain words of the phasing plan incorporated into the master deed make clear that the unannexed areas were not part of the condominium, and thus its common elements, until annexed. Not discouraged, GS points to the boilerplate master deed provisions referencing Lot 9.05. While GS now points to these provisions, courts have long held it is useful to "look to . . . the parties' course of dealing, usage and course of performance." Township of White v. Castle Ridge Dev. Corp., 419 N.J. Super. 68, 77 (App. Div. 2011) (quoting Elliott & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 328 (3rd Cir. 2006)).

The prior developer and GS did not treat the unannexed phases of Lot 9.05 as condominium common elements. First, to satisfy a mortgage, the prior developer transferred the unannexed phases to GS without needing any approval of the unit owners. Second, both the prior developer and GS were able to annex phases of Lot 9.05 to the condominium, build units and then sell the units for value. Neither the prior developer nor GS shared this value with the unit owners. The course of

14

performance of the prior developer and GS does not establish that the unannexed phases were part of the condominium common elements.

B.

While the master deed does clearly describe a phased expandable condominium, there is contradictory language. The contradictory language is found in the introductory and definitional sections and describes the condominium as consisting of all twenty-one acres of land from the outset. The contradictory language tracks generic boilerplate provisions found in a New Jersey condominium treatise. See New Jersey Condominium and Community Association Law §§ 6:1, 6:2.30, 6:2.12, 6:15.01(a) (1996); §§ 6:1, 6:2.31, 6:2.12, 6:5.01(a) (2025).

"In the event of potentially contradictory terms, 'the several parts of a contract should be so construed as to avoid conflict.'" Universal N. Am. Ins. Co. v. Bridgepointe Condo. Ass'n, Inc., 456 N.J. Super. 480, 494 (Law. Div. 2018) (quoting Silverstein v. Dohoney, 32 N.J. Super. 357, 364 (App. Div. 1954), aff'd sub nom. Silverstein v. Keane, 19 N.J. 1 (1955)). "Moreover, a subsidiary provision should not be interpreted in such a manner as to conflict with the obvious or dominant purpose of the contract." Wheatly v. Sook Suh, 217 N.J. Super. 233, 240 (App. Div.

1987) (citing <u>Newark Publishers' Assn. v. Newark Typographical Union</u>, 22 N.J. 419, 426 (1956)).

The contradictory language merely describes the extent of the finished project. It does not defeat the master deed's obvious and dominant purpose of establishing an expandable condominium satisfying Fannie Mae phasing requirements and thereby opening the door to preferred financing. Having financing saleable to Fannie Mae facilitates the sale of units. Loans eligible for Fannie Mae purchase have lower interest rates. Darryl E. Getter, Cong. Rsch. Serv., R46980, <u>Single-Family Mortgage Pricing and Primary Market Policy Issues</u> 7 (Dec. 2, 2021). Selling a loan to Fannie Mae frees up funds for further lending. Lenders are more likely to underwrite a mortgage loan which is saleable to Fannie Mae.

As a contract, the master deed is presumed to have been created with reference to existing law. <u>Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C. v. Lowenstein Sandler, P.C.</u>, 365 N.J. Super. 241, 248 (App. Div. 2003). The law is a silent factor in interpreting a contract such as the master deed. <u>Associates Home Equity Servs., Inc. v. Troup</u>, 343 N.J. Super. 254, 276 (App. Div. 2001) (citing <u>Silverstein</u>, 19 N.J. at 13). Since the creation of an expandable condominium to satisfy Fannie Mae phasing requirements is the obvious and dominant purpose, the court reads the master deed with an eye towards fulfilling the rationale for phasing. On the surface, the rationale for phasing is the reduction of mortgage loan default.

Just as importantly, the underlying rationale is fulfilling Congress' goal of a robust secondary mortgage market that encourages home ownership. A holistic examination of both rationales guides the interpretation of the master deed.

Without phasing, the expenses of the entire parcel could saddle the unit owners of an uncompleted project with added expenses. See generally 38 C.F.R. § 36.4364(a)(6). These expenses include taxes, insurance and maintenance costs. These additional costs would cause unit owners financial distress which in turn may impair their abilities to pay their mortgage loans.

Without phasing, a developer could realize a free ride on the backs of unit owners to cover the taxes, insurance and maintenance of the entire parcel. While regulations of the New Jersey Department of Community Affairs (DCA) seek to curb cost-shifting to unit owners, such provisions are not foolproof.[9,10] See N.J.A.C. 5:26-8.6(b). A developer's obligation to cover expenses of unannexed areas under

---

[9] The DCA has adopted regulations pursuant to New Jersey's Planned Real Estate Development Full Disclosure Act to thwart a developer's free ride. However, DCA has conceded this regulatory effort has led to confusion and contention forming the impetus for litigation. 52 N.J.R. 1257(a) (June 15, 2020). Recent DCA amendments attempt to alleviate these pitfalls. Ibid., N.J.A.C. 5:26-8.6(b). Moreover, this cost-shifting only applies to costs such as insurance and maintenance, not taxes.

[10] Parenthetically, phasing is not foolproof either. "A dilemma is created when a developer seeks to convey the entire development's recreational amenities to [a condominium] in the first [phase], with support anticipated to be spread over future [phases]." 45 Fed. Reg. 58284, 58286 (Sep. 2, 1980).

any equitable theory of unjust enrichment or regulatory pronouncement does not take the place of hard cash needed to cover the expenses in the event of developer default. The threat of a developer failing is real. In this case, GS took the property by way of a deed-in-lieu of foreclosure after the prior developer constructed thirty-three units.

Under GS's theory, if it did not step in and complete the project, the thirty-three unit owners would have been strapped with the taxes, insurance and maintenance costs for the entire twenty-one acres of Lot 9.05. That is absurd. GS's conceptualization of phasing increases the risk of unit owner mortgage loan default. This undercuts a key purpose of Fannie Mae phasing.

Ironically, if GS was correct, unit owners would be better off without phasing. Without phasing, initial filing of the master deed would have created all 168 units at once.[11] With the prior developer's default, the thirty-three unit owners faced picking up the slack for the maintenance and insurance of the entire twenty-one acre parcel. However, per the FHA-inspired condominium tax assessment statute, each unit owner's tax responsibility would have been limited to their unit and a 1/168 share of the common elements. See N.J.S.A. 46:8B-19. Units not owned by the defaulting developer would have faced tax sale. See High Point, 442 N.J. Super. at 145. Under GS's theory, the default of the prior developer would have left each unit owner

---

[11] Initially, 170 units were planned, but were later reduced to 168 units.

responsible for a one-thirty-third share of the taxes on the entire twenty-one acres. This certainly turns the concept of phasing on its head.

Phasing is part of a comprehensive scheme to maintain the quality of the mortgage loans purchased by Fannie Mae. Maintaining this quality ensures a market for the mortgage-backed securities created and sold by Fannie Mae. With Fannie Mae purchasing existing loans, lenders have funds available to make new loans. Ultimately, this availability of financing fosters home ownership. The master deed must be read with an eye towards fulfilling the policy rationales embodied in Fannie Mae phasing.

## IV.

Like Fannie Mae phasing, the goal of the FHA mandated tax assessment provision of the Condominium Act, N.J.S.A. 46:8B-19, is to reduce mortgage loan default. However, GS wants to use this section to erode this protection by making unit owners liable for taxes on unannexed phases.

The tax assessment provision has its roots in a 1962 model act promulgated by the FHA. FHA Model Statute for the Creation of Apartment Ownership (1962), reprinted in James H. Backman & David A. Thomas, A Practical Guide to Disputes Between Adjoining Landowners — Easements § 15.10[1] (1989) [hereinafter Model Act]. FHA designed the Model Act to implement section 234 of the Housing Act of 1961. Pub. L. No. 87-70, § 234, 75 Stat. 149, 160 (codified as amended at 12 U.S.C.

19

§ 1715y). Section 234 mandated that the FHA offer mortgage insurance for condominium units.[12] Ibid. This insurance encouraged lenders to provide mortgage loans on qualifying condominium properties. FHA's section 234 regulations required that "[p]roperty taxes in the jurisdiction where the family units are located are assessed and levied against each family unit as a taxable entity and are not assessed and levied against the multifamily structure." 26 Fed. Reg. 7378, 7498 (Aug. 12, 1961), 24 C.F.R. § 234.26(d)(3)(1962). See also 24 C.F.R. § 234.26(d)(3) (2025).

To that end, the Model Act provides each unit "shall be subject to separate assessment." [13] Model Act § 22. Also, "[n]either the . . . the property nor any of the common areas and facilities shall be deemed to be a parcel."[14] Ibid. Liens are against each separate unit. Model Act § 9.

---

[12] Mortgage insurance proceeds are made available to the lender upon the default of a unit owner.

[13] See Appendix, infra, for pertinent parts of the FHA Model Act.

[14] Since the Model Act is geared towards high-rise buildings, "building" is also mentioned.

By the end of 1963, thirty-eight states, including New Jersey, adopted the Model Act in some form or another.[15,16] William K. Kerr, Condominiums – Statutory Implementation, 38 St. John's L. Rev. 1, 5 (1963). Compare Model Act §§ 22, 9 with N.J.S.A. 46:8B-19, 9(o). The tax assessment provisions first appearing in the 1963 Horizontal Property Act essentially carried over to the 1970 Condominium Act. Compare N.J.S.A. 46:8A-26, -20 with N.J.S.A. 46:8B-19, 9(o).

When there is a close parallel between a New Jersey statute and an almost identical model act, the analysis begins with an examination of the model act and its legislative history and purpose. Town Tobacconist v. Kimmelman, 94 N.J. 85, 99 (1983). Without some form of the Model Act, a delinquent unit owner could financially impair other unit owners' abilities to pay their mortgage loans.

In most jurisdictions, unpaid taxes are a senior lien on the property. 2 Bender's State Taxation: Principles and Practice §18.04[2][a] (Charles W. Swenson ed., 2025). See also N.J.S.A. 54:5-9. In other words, taxes are senior to mortgage liens. Ibid. A tax lien can be foreclosed. Bender's State Taxation §18.04[2][a]. See

---

[15] By 1969, all fifty states had some form of the Model Act on the books. Nicholas M. Cannella, Note, Recent Innovations in State Condominium Legislation, 48 St. John's L. Rev. 994 (1974).

[16] Notably, the Governor conditionally vetoed the Horizontal Property bill. The Governor wanted more definitive language as to separate assessment. Governor's Veto Statement to S. 161 1-2, 4 (Dec. 9, 1963). The Legislature acquiesced and passed an amended bill. Compare Veto Statement 4 with L. 1963, c. 168, § 26.

also N.J.S.A. 54:5-86. The foreclosure of the senior lien extinguishes all junior liens. 5A Real Estate Financing § 9A.01[3] (2025). See also N.J.S.A. 54:5-87.

Under a common law property ownership regime, the unit owners would hold the common elements as tenants-in-common. If one unit owner did not pay its share of the taxes, there would be a lien on the entire condominium. The other unit owners would then have a tough choice. They could either (1) pay the delinquent owner's taxes, or (2) face foreclosure of the entire condominium common elements. Either way, nondelinquent owners face financial challenges not of their own doing. Both options lead to increased chances of mortgage loan default. The Model Act's separate assessment provision reduces this default risk.

Early commentary from around the time of implementation confirms the Model Act's objectives. Namely, "[b]y decreasing the degree of financial interdependence among unit owners, separate assessment minimizes risk of loss for both owners and mortgagees." John E. Davidian, Note, Condominium Unit Real Estate Tax Assessment Problems, 48 St. John's L. Rev. 923, 927 (1974). See also Curtis J. Berger, Condominium: Shelter on a Statutory Foundation, 63 Colum. L. Rev. 987, 1019-20 (1963) (discussing risk of "financial interdependence" caused by blanket tax liens).

Like the Model Act, New Jersey's implementation also strives to prevent the financial interdependence of unit owners. The court must read New Jersey's statute

22

with an eye towards the Model Act's underlying goals of protecting the financial standing of unit owners directly and lenders indirectly. Keeping defaults at a minimum ensures the viability of the congressionally mandated FHA credit insurance program which New Jersey supports through enactment of its version of the Model Act.

## V.

## A.

GS further argues that a 2020 proposal to overhaul the 1970 Condominium Act demonstrates that the current statute does not allow taxation of GS's property.[17] See S. 2261 (2020). The proposal would allow "any portion of the common elements for which the declarant has reserved a development right [to] be separately taxed against the declarant . . . ." Id. at 6 (emphasis added) (proposed N.J.S.A. 46:8E-4(b)).

The proposed section is inapposite since the issue here is not the taxation of condominium common elements, but the taxation of areas not yet annexed to the condominium. GS annexed phases to the condominium when it was ready to

_____

[17] While the Assembly initially considered A. 4265 (2020), the Assembly substituted and voted upon S. 2261.

commence development. As spelled out in the master deed, GS "annex[ed] the remaining land and [u]nits" to "expand the [c]ondominium" as the development progressed.[18],[19]

---

[18] Despite passing both houses, the Governor absolutely vetoed S. 2261 on November 8, 2021. The Governor did not address any particular provision of the bill or policy concern. The Governor was generally concerned that "[r]ather than streamlining and simplifying New Jersey's statutes in this area, [the bill] would add yet another incomplete source of law to the body of law applicable to common interest communities" and "would create confusion for community associations, their residents, developers, and their attorneys, who would be required to consult yet another set of rules and guidelines and determine whether new or old provisions conflict." Governor's Veto Statement to S. 2261 (1st Reprint) 2, 3 (Nov. 8, 2021). The Governor's veto message is part of the legislative process. Evans v. Atlantic City Bd. of Educ., 404 N.J. Super. 87, 94 (App. Div. 2008); DePace v. Dir., Div. of Taxation, 32 N.J. Tax 302, 313 (2020). To claim that the legislation vetoed in 2020 provides guidance in interpreting the 1970 Condominium Act is unreasonable.

[19] GS also raises the Appellate Division's decision in High Point, 442 N.J. Super 123. The High Point developer recorded the master deed in 1971, some years before the existence of Fannie Mae phasing provisions. Id. at 125. The High Point master deed annexed all the units at once upon recordation. Ibid. The court held that annexed units, even if undeveloped, are taxable. Id. at 135-36. Since High Point deals with taxation of annexed units, it is inapposite.

      The municipality raised this court's decision in Glenpointe Assocs. v. Township of Teaneck, 10 N.J. Tax 288 (Tax 1988). In Glenpointe, there was not any disagreement over what constituted the common elements. Id. at 293. Fannie Mae phasing was not an issue. Many of the loans would likely have exceeded Fannie Maes loan limitations. See Id. at 296-97 (sale prices). Fed. Hous. Fin. Agency, Report to Congress 2020 129 (2020) (historic loan limitations). Rather, the dispute was over whether the "value of the common elements . . . can only be . . . included in [] the value of the completed condominium units." Glenpointe, 10 N.J. Tax at 294. The court held that both the built and unbuilt units in the annexed areas (regime "A") would share in the assessed value of the common elements. Id. at 305. The "future" units in regime "B" would not share in the assessed value of the common elements. Ibid. Since there was not any dispute over what constitutes common elements, the decision is of limited value in deciding this matter.

B.

The assessor's designation of annexed and unannexed areas on the same tax lot, namely Lot 9.05, does not defeat separate taxation of the unannexed areas. The condominium here is an expandable condominium where each phase is not on a different lot. Divining the exact delineation between the annexed areas which contain the common elements, and the unannexed areas is difficult. However, that is not the issue now before the court.

This motion concerns the appropriateness of a separate assessment for the unannexed areas, not the quantum of assessment. Regardless of the exact delineation, the unannexed areas have value. To decide this motion, the court does not have to exactly delineate the boundary between the annexed and unannexed areas.

The lack of exact metes and bounds does not defeat the annexation of the unannexed areas to the condominium. While preferable, an exact delineation is not necessary. Unclear descriptions have given rise to many boundary disputes in the past. Courts have devised a hierarchy of descriptions to resolve boundary disputes with natural monuments (e.g. trees) at the top and place names at the bottom. Stransky v. Monmouth Council of Girl Scouts, 393 N.J. Super. 599, 609 (App. Div. 2007). See also Normanoch Ass'n. v. Baldasanno, 40 N.J. 113, 134-35 (1963) (deed

25

conveyed "lands covered by the waters of Culvers Lake . . . a map thereof being filed . . . ." without any metes and bounds description). Here, all we have are place names (i.e. phase one, phase two, etc.). While this may lead to disputes over the quantum of land encompassed by a particular phase, it does not defeat the annexation.

The lack of exact metes and bounds does not defeat an assessment. "The assessor [] make[s] a list in tabular form of the names of the owners, and set[s] down in proper columns opposite each name the description and area of each parcel sufficient to ascertain its location and extent and the taxable value of each parcel as determined by him." N.J.S.A. 54:4-24. To that end, the Legislature mandated the creation of maps for every municipality except townships with a population of less than 2,500. See N.J.S.A. 54:1-15. While the population of the municipality here exceeds 2,500, the Legislature did not mandate exact delineation on a tax map as an absolute prerequisite for capturing assessed valuation. This comports with "[t]he fundamental approach of our statutes that ordinarily all property shall bear its just and equal share of the public burden of taxation." Town of Bloomfield v. Acad. of Med. of N.J., 47 N.J. 358, 363 (1966). See also Advance Hous., Inc. v. Township of Teaneck, 215 N.J. 549, 566 (2013) (quoting Int'l Schs. Servs., Inc. v. Township of West Windsor, 207 N.J. 3, 15 (2011)) ("public tax burden is to be borne fairly and equitably").

26

The assessor assessed the annexed and unannexed portions of Lot 9.05 separately. While exact delineation between the annexed and unannexed areas would make the job of valuation easier, the absence of exact delineation does not defeat separate assessment of the unannexed areas.

VI.

FHA credit insurance and Fannie Mae securitization foster the Congressional policy of encouraging home ownership. The FHA and Fannie Mae provisions separately guard against mortgage loan defaults. GS wants to read the provisions together in such a way that undermines these guardrails and Congressional policy.

The availability of financing saleable to Fannie Mae broadens the pool of potential unit buyers. More potential buyers translate into more desirable and valuable units. Having realized the benefits of financing saleable to Fannie Mae, GS cannot rely upon the FHA-inspired condominium taxing statute to undermine Fannie Mae phasing and realize a property tax windfall.

"Court[s] ha[ve] observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice . . . ." Gen. Trading Co. v. Dir., Div. of Taxation, 83 N.J. 122, 136 (1980). No one doubts the prior developer and GS made a wise choice in structuring a phased expandable condominium to enjoy the benefits of financing saleable to Fannie Mae. However, with that choice, GS cannot now expect to avoid

27

taxation on the unannexed portions of Lot 9.05 which were not part of the condominium.

## VII.

For the foregoing reasons, the court denies GS's motion.

Appendix – Pertinent Parts of Model Act and Statutes.

FHA Model Act of 1962.

Each apartment and its percentage of undivided interest in the common areas and facilities shall be deemed to be a parcel and shall be subject to separate assessment and taxation by each assessing unit . . . . Neither the building, the property nor any of the common areas and facilities shall be deemed to be a parcel.

[Model Act § 22.]

[N]o lien shall thereafter arise or be effective against the property.  [L]iens or encumbrances shall arise or be created only against each apartment and the percentage of undivided interest in the common areas and facilities appurtenant to such apartment, in the same manner and under the same conditions in every respect as liens or encumbrances may arise or be created upon or against any other separate parcel of real property subject to individual ownership. . . .

[Model Act § 9.]

Horizontal Property Act of 1963.

 All property taxes, assessments and other charges of any taxing district shall be assessed against and collected on each individual apartment, each of which shall be carried on the tax books as a separate and distinct entity for that purpose, and not on the building or property as a whole. Such assessments shall include the value of the proportionate undivided interest of each apartment in the general common elements, and in the limited common elements where such interest exists.

[N.J.S.A. 46:8A-26.]

[N]o lien shall arise or be effective against the property. [L]iens or encumbrances shall arise or be created only against each apartment and the percentage of undivided interest in the common elements appurtenant to such apartment, in the same manner and under the same conditions in every respect as liens or encumbrances may arise or be created upon or against any other separate parcel of real property subject to individual ownership . . . .

[N.J.S.A. 46:8A-20.]

Condominium Act of 1970.

All property taxes, special assessments and other charges imposed by any taxing authority shall be separately assessed against and collected on each unit as a single parcel, and not on the condominium property as a whole. Such taxes, assessments and charges shall constitute a lien only upon the unit and upon no other portion of the condominium property. . . .

[N.J.S.A. 46:8B-19.]

"Unit" means a part of the condominium property designed or intended for any type of independent use . . . and includes the proportionate undivided interest in the common elements and in any limited common elements assigned thereto . . . .

[N.J.S.A. 46:8B-3(o).]